**PIOCHE MINES CONSOLIDATED, INC.,**
Ely Valley Mines, Inc., and John
Janney, Appellants,

v.

Helen DOLMAN et al., Appellees.

John JANNEY, Appellant,

v.

Helen DOLMAN, Appellee.

Nos. 17709, 18192.

United States Court of Appeals
Ninth Circuit.

May 21, 1964.

Rehearings Denied Aug. 3, 1964.

Morse & Graves, Las Vegas, Nev., Roscoe H. Wilkes, Pioche, Nev., T. David Horton, Arlington, Va., for appellants.

Theodore A. Kolb, Gerald J. O'Connor, Sullivan Roche, Johnson & Farraher, San Francisco, Cal., Alvin N. Wartman, Las Vegas, Nev., for appellees.

Before HAMLEY, BROWNING and DUNIWAY, Circuit Judges.

DUNIWAY, Circuit Judge.

Before us are 10 appeals, 9 in No. 17,-709 and 1 in No. 18,192, all of which have been consolidated here. To a considerable extent, they are an imposition on this Court. Appellants' opening brief is 338 printed pages long, not counting 23 pages of appendix. It bears the characteristic stigmata of a forensic effort produced under the influence of strong emotion and written in the vocative. It is an unbridled attack on appellees, their counsel, and the trial judge. It starts with an assertion, repeated ad nauseam, that the judge accepted and acted upon allegations that he knew to be false, and goes on from there, piling up charges on nearly every page. Material under the heading: "Questions presented" begins on page 36 and continues to page 87. There are set forth some 298 "questions" supposedly raised by the appeals. Nearly all of them are loaded with assertions, innuendoes and assumptions. We cite two examples, chosen at random, that are fairly typical:

> "May a court, in granting an intervention, prejudge contested issues"?

> "May a court conduct proceedings in an atmosphere hostile to one side"?

How such "questions" can help us to decide this case is beyond our comprehension.

The "specifications of error on which appellants rely" begin on page 87, and

continue to page 151. There are 29 numbered "specifications," but each has many subdivisions, and they total 433. Needless to say, this type of specification of error is extremely burdensome rather than helpful to this Court. Appellants' printed reply brief is of 63 pages, and is accompanied by a two volume typewritten "supplement" of 276 pages. Were it not for the fact that to do so would further prolong this already protracted litigation, we would strike these "briefs" from the files.

One of the difficulties that confronted the trial judge, and that confronts us in trying to review what he did, is that appellants and their counsel have engaged throughout, in a course of obstruction and obfuscation. Their entire efforts seem to have been devoted to resisting discovery and to resisting trial. Their conduct exemplifies the old saying: if you can't try the case, try your opponent; if you can't try your opponent, try his lawyer; if you can't try his lawyer, try the judge. Appellants claimed from the beginning that the two actions constituted an abuse of process, and in their efforts to persuade the court to accept that view they subjected the court to a veritable blizzard of motions and papers, some bearing such truly anomalous titles as "Application for relief from misuse of court process obtained by fraud." What is sometimes called the "Clerk's transcript" consists of five volumes containing 1473 pages of assorted pleadings, motions, affidavits, exhibits and miscellaneous other papers, some of which were never before the trial court.

Throughout, appellants' position has been that the litigation is totally without merit. One cannot help wondering why, if this is so, appellants did not promptly answer, press for an early trial, and get a judgment to that effect. The charges of fraud, corruption, and worse, that counsel so freely flings at appellees, their counsel, and the court, are not supported by the record.

We will endeavor, within what we hope will be reasonable limits, to extract from the record, and to decide, those questions that seem to us to be worthy of consideration. To the extent that we do not discuss the "specifications of error" they are hereby rejected; to the extent that we do not answer the "questions presented," we reject them as not requiring answers.

1. *The appeal in No. 18,192.*

In No. 18,192 there is but one appeal. That action, numbered 310 below, was begun by appellee Dolman as a stockholder of Ely Valley Mines, Inc., a Nevada corporation (Ely), and Pioche Mines Consolidated, Inc., a Nevada corporation (Pioche), and on their behalf, seeking access to the records of the corporations. The defendants are John Janney, President, and one Calhoun, Secretary, of each of the two corporations. An amended complaint was filed on February 18, 1960, accompanied by a motion for an order granting access to the records, supported by an affidavit. The court, on the same day, granted the motion by an ex parte order. Armed with the order, Dolman did obtain an examination of the records.

No further action appears until over a year later, on March 13, 1961, when Janney filed an answer and counterclaim, charging that Dolman, in bringing the action, "perpetrated a complexity of frauds upon the Court." There follows a long statement of the alleged frauds, and a counterclaim, based upon similar charges. It names as counter-defendants Dolman and her attorneys. It contains some 13 counts, which pray for various amounts of damages, ranging from $18,-000 to $800,000, plus large sums of punitive damages based upon alleged obtaining of money by false pretenses (count one), obtaining property for services not performed (count two), and by fraud (count three), interference with business relationships (counts four, five), stirring up stockholders and bringing malicious lawsuits (count six), abuse by counsel of information obtained in confidence (counts seven, eight), and libel (counts nine, ten, eleven, twelve and thirteen). This interesting document occupies pages 378 to 467 of the transcript. It was ac-

companied by a motion to bring in the attorneys as cross-defendants. Simultaneously, counsel filed an affidavit charging the trial judge with prejudice.

Appellee Dolman filed an answer to the counterclaim on April 14, 1961. On April 20, she noticed the taking of Janney's deposition, at Las Vegas, on May 8, 1961. On May 4, 1961, Janney moved for an "order to show cause". In the motion, he sought an injunction against appellee Dolman that would prevent her "from making or circulating any further false statements" concerning him and the corporation, and other similar relief. A dismissal of the action and an injunction against further actions were also demanded. Much of this document is a rehash of the counterclaim.

■ Appellant Janney claims that on May 23, 1962, the trial judge refused to hear this motion, and the appeal is from this purported refusal. The record, however, shows only a request that the court set a date to hear it. The court said it could not do it "this morning." Court and counsel then reverted to a consideration of other matters, in another case. No order was made. There is nothing from which to appeal. The appeal should be dismissed.

### 2. The appeals in No. 17,709.

In No. 17,709, there are nine appeals. The action, No. 311 in the trial court, was filed by Dolman on February 20, 1960. It is a stockholders' derivative action, brought on behalf of stockholders of Pioche and Ely against them as nominal defendants, and Janney and a number of Does. It alleges that plaintiff is a citizen of California, that the two corporations are Nevada corporations, and, on information and belief, that Janney is a resident of Virginia. In substance, it is charged that Janney is president and in control of both corporations, that they have Nevada properties worth over $2,000,000, that Janney has permitted taxes to become delinquent and refuses to pay them and has failed to pay wages of employees, and that as a result the properties may be lost. It is also charged that Janney has mismanaged the corporations, and diverted their assets to his own use, damaging the corporations in an amount exceeding $1,000,000.

On April 4, 1960, the two corporations answered. In addition to denials, the answer alleged that Janney resided in Nevada, charged Dolman with obtaining her stock by fraud, and alleged that the action was prosecuted for purposes of harassment. It contains a counterclaim, making similar charges. It also alleged failure to comply with Rule 23(b), F.R. Civ.P.

On August 1, 1960, the corporations filed a document entitled "application for relief from misuse of court process obtained by fraud." This charges, in substance, that the action, and the prior action No. 310, were strike suits, filed following refusal of Janney to yield to certain extortionate demands by appellee Dolman. It asks for a citation, purportedly under 18 U.S.C. § 401, directed to Dolman, with a view to punishing her for contempt.

On August 3, 1960, Dolman answered the counterclaim. On August 26, she filed a reply to the "application for relief." On October 17, 1960, she asked leave to file an amended complaint. On October 19, she noticed the taking of the depositions of the corporations, by taking the deposition of Janney, on October 27, at the office of Pioche, in Pioche, Nevada. The notice required that the companies produce certain records. Janney did not appear. On November 3, Dolman moved for the corporations' default by reason of Janney's failure to appear.

The case (No. 311) was consolidated with certain other pending cases by an order made November 3, 1960. These are Fidelity-Philadelphia Trust Company v. Pioche Mines Consolidated, old No. 101, now No. 1221 (the Fidelity case), action No. 310, and Dodd, et al. v. Pioche Mines Consolidated, No. 1523 (the Dodd case). This order also set aside the hearing dates of all pending matters, and set pretrial for December 8. All parties

were directed to submit, within 14 days, memoranda as to all pending matters.[1]

On November 28, 1960, appellants, by their present counsel (former counsel having sought to withdraw) filed in the "consolidated" cases and in another case, Callahan Mining Corporation v. Ely Valley Mines, Inc., Nos. 17 and 26 (the Callahan case) an application for an injunction that would prevent all other parties from filing any more papers in any of the cases.

On May 29, 1961, Janney answered. This lengthy document contains the same charges of fraud, and the same counterclaim against Dolman and her attorneys, as the answer that was filed in No. 310, in March. It is an amazing melange of evidentiary statements, arguments, quotations from prior proceedings, etc., about as far from what a pleading ought to be as can be imagined.

On June 5, 6 and 7, 1961, the court conducted hearings, at which it passed on a large number of matters then pending in the four cases. In No. 311, it denied, without prejudice, the November 28, 1960 application for injunctive relief, granted a motion for relief from the depositions noticed, quashed the notice of deposition, denied a motion to re-calendar, denied the motion for default, granted leave to file an amended complaint, denied the application for relief from misuse of court process, and postponed pre-trial.

The amended complaint was filed June 6, 1961. It adds, as plaintiffs, four other stockholders of long standing, three residents and citizens of Virginia, and one of Arkansas. On information and belief, it alleges that Janney is a resident and citizen of Virginia, thus apparently destroying diversity of citizenship. On June 19, 1961, appellants moved to dismiss on that ground. On October 31, 1961, Dolman moved in open court for leave to strike the word "Virginia" and insert the word "Nevada" in the allegation as to Janney's citizenship. This motion was granted, and the change written in by hand.[2] Janney had previously filed a sworn statement that he was a citizen of Nevada.

On July 3, 1961, Dolman answered Janney's counterclaim. On August 16, she

---

1. The order states that the actions are "consolidated for any and all purposes relevant to their final disposition." Its immediate purpose was the disposition of a large number of motions and other matters then pending. This was later done, on June 6, 7 and 8, 1961. Matters in each case were then taken up separately, and thereafter each case was treated separately. The order thus became a dead letter.

2. The "questions" that appellants raise as to this action are fairly typical of their brief.
"(a) May a Court refuse to hear a Motion to Dismiss a Complaint for failure to show required diversity of citizenship?
"(b) May a Court allow an alteration of such a Complaint in an effort to show the required diversity?
"(c) May a Court allow a material alteration of a Complaint required by the Federal Rules of Civil Procedure to be sworn without this alteration being made pursuant to the procedure prescribed by the Federal Rules of Civil Procedure and without said alteration being sworn?
"(d) May a Court allow such alteration without requiring a showing that preju-

dice to the Defendants would not result; without requiring a showing of excuse or reason why the unamended Complaint was false in a material respect when sworn by the Complainant; without requiring a showing of circumstances that would warrant the amendment; and without determining the issues raised by Appellants' Motion for Order to Show Cause, Motions to Quash Notices of Deposition, and Application for Relief from Misuse of Court Process Obtained by a Fraud?
"(e) May a Court proceed on such defaced Complaint which purported to be the sworn statement of the Affiant, which it was not?
"(f) May a Court proceed on such defaced Complaint to the serious prejudice of Defendants' rights?
"(g) Does such procedure deprive Defendants of due process?"
The specification of error is similar:
"(u) The alteration of the sworn Complaint in a material matter (T 353:4–9) was forgery (R 984:19–22)."
The procedure was perfectly proper. Rule 15(a) F.R.Civ.P.; Molnar v. National Broadcasting Co., 9 Cir., 1956, 231 F.2d 684.

noticed the taking of his deposition, at Las Vegas, on September 19. On August 30, appellants filed a motion to quash the notice, claiming harassment, and also that plaintiffs had no standing to sue, that the court lacked jurisdiction, that Dolman's counsel were disqualified, and that it was improper to take the deposition while the appellants' May 1, 1960 motion for order to show cause[3] and June 16, 1961 motion to dismiss were pending. So far as appears, no opposition was filed and no action on this motion was taken. Janney did not appear on September 19.

On October 6, 1961, Dolman filed another notice to take Janney's deposition, at Las Vegas, on October 31. On October 20, another motion to quash was filed, on substantially the same grounds, plus a claim of poor health. It was accompanied by an affidavit of a Utah naturopath, stating that Janney was ill. Opposition was filed on October 27.

On October 31, a hearing was had on the motion to quash. On that day, with permission of the court, Dolman also filed a motion to strike pleadings of defendants, for default judgment, and for appointment of a receiver of the two corporations. The motion was accompanied by affidavits. The court denied the motion to quash, but ordered an inquiry into Janney's health, to take place next day at 2:00 o'clock. It further ordered that, if Janney failed to submit to examination, it would strike his pleadings and enter judgment against him. Next day, Janney did not appear; the court heard certain testimony and granted the motion to strike and for default. A formal order was filed on November 2.

Notice of appeal from the minute order of November 1 was filed November 6, 1961. We call this

*Appeal No. 1.*

A second "supplemental" notice of appeal, from the November 2 order, was filed on December 18. We call this

*Appeal No. 2.*

On November 7, the court ordered a hearing on November 15, so that judgment could be entered. The hearing began on that date. On December 4, defendants filed a motion to set aside the November 2 order. This motion was heard on December 6, and denied, and a formal order of denial was filed on December 15.

On December 6, a minute order was made, granting Dolman's petition for appointment of a receiver, and temporary restraining order. Counsel was directed to prepare a formal order. Similar directions were given to counsel on December 7. On January 4, 1962, a notice of appeal from these orders was filed. We call this

*Appeal No. 3.*

A formal "restraining order and order re receiver" was signed and filed January 24, 1962, but the receiver was not then appointed. On February 5, 1962, a notice of appeal from this order was filed. We call this

*Appeal No. 4.*

On February 6, 1962, a motion was filed for an order requiring Dolman, et al., to give security in connection with the restraining order, as required by Rule 65(c), F.R.Civ.P. On March 16, 1962, a formal order, appointing one Americo Campini receiver of the two corporations, with bond of $150,000, was signed and filed. This order also contains a restraining order similar to that of February 5. On April 6, 1962, a notice of appeal from the March 16 order was filed. We call this

*Appeal No. 5.*

On March 20, 1962, the receiver petitioned for instructions. This petition was granted, and the receiver instructed, on the same day. On April 6, 1962, a notice of appeal from the March 20 order was filed. We call this

*Appeal No. 6.*

On March 26, 1962, appellants filed a motion to remove the receiver and "for

3. No such document appears in the transcript. There is such a document, filed May 4, 1961, in No. 310.

general relief." On April 9, 1962, a motion to stay the order appointing receiver was filed. On May 18, 1962, a notice of appeal from the denial of the motions of March 26 and April 9, 1962 was filed. This notice states that the motions were denied by the refusal of the court, on April 25, to hear them. We call this

### Appeal No. 7.

On April 25, 1962, the receiver filed his "first report" and petition for instructions. Objections were filed by appellants on April 27. On May 8, the receiver filed a request for authority to issue receiver's certificates, and another request for instructions. Opposition was filed May 10. Opposition to the motion for authority to issue receiver's certificates was filed May 21, 1962. On May 24, the court made an order instructing the receiver. On May 31, 1962, a notice of appeal from this order was filed. We call this

### Appeal No. 8.

On October 8, 1962, judgment was filed and entered. This judgment continues the receivership, restrains appellant Janney and the corporations from disposing of any of the assets or records of the corporations, restrains Janney from disposing of his stock in the corporations, and gives judgment, in favor of the receiver and against Janney, in the sum of $1,000,000, plus interest and costs of $1,299.29. It awards Dolman her expenses in prosecuting the action, plus "compensation" for her services, and fees to her attorneys. It directs that sums collected be apportioned between and paid to Dolman, her attorneys, and the stockholders of Pioche Mines Consolidated, Inc., exclusive of Janney. It retains jurisdiction for two purposes: to change the amount of the receiver's bond, and to instruct the receiver. Findings of fact and conclusions of law were filed at the same time. A notice of appeal from this judgment was filed on October 16, 1962. We call this

### Appeal No. 9.

A. *Threshold Contentions.*

Appellants make several contentions that go to the right of the District Court to proceed at all. We consider these first.

1. *Jurisdiction of the trial court.*

█ Jurisdiction is based upon diversity of citizenship (28 U.S.C. § 1332). The allegations of the original complaint showed the necessary diversity. But when the complaint was amended by adding new plaintiffs, some of them citizens of Virginia, diversity no longer appeared, it being also alleged that defendant Janney was a citizen of Virginia. This difficulty was eliminated by the amendment which the court permitted on October 31, 1961. Janney can hardly complain—he had alleged in his answer, filed on May 29, 1961, that he was a citizen of Nevada. The plaintiff, and the court, took him at his word. Under 28 U.S.C. § 1653, a complaint may, with the permission of the court, be amended to show jurisdictional facts. Molnar v. National Broadcasting Co., 9 Cir., 1956, 231 F.2d 684. The trial court had jurisdiction.

2. *Claimed failure to comply with Rule 23(b), F.R.Civ.P.*

The original complaint is certainly deficient in this respect. It does not allege that Dolman was a shareholder at the time of the transactions of which she complains, (Rule 23(b) (1)) or that the action is not collusive (Rule 23(b) (2)), and does not set forth with particularity the efforts made to secure the desired action from the trustees or directors or shareholders. It does allege, however, that Janney has for many years controlled the operation of the corporations, has purported to act through a board of directors, but in fact, has individually managed, directed and controlled all of their activities, that he has left Nevada, and that the properties, assets and business of the corporations have been abandoned by the management and directors and by Janney. The complaint was accompanied by a motion for an order requiring payment of taxes on certain of the corporations' properties, together with an affidavit stating that but one stockholders' meeting of Ely, (and none of Pioche), has been held for many years, that demand that such meetings be held

has been ignored, that Janney has denied plaintiff Dolman access to the books, that he has filed incorrect lists of directors with the Nevada Secretary of State, and various other matters.

The amended complaint adds four plaintiffs, each of whom is alleged to have been a stockholder of the corporations at all times mentioned in the complaint. Dolman acquired her shares on November 23, 1955. It also contains the required allegation that the action is not collusive.

■■ We have recently held that the requirements of Rule 23(a) F.R.Civ.P. are not jurisdictional. Harris v. Palm Springs Alpine Estates, Inc., 9 Cir., 1964, 329 F.2d 909. The reasoning applies equally to Rule 23(b). Jurisdiction is conferred by act of Congress. The Rules do not purport to diminish that jurisdiction. The purpose of Rule 23(b) is to protect the courts from collusive actions, and to protect corporations and their officers and directors from strike suits. It deals with procedure and relief, not jurisdiction.

■ We think that the complaint, the affidavit,[4] and the amended complaint show sufficient compliance with the Rule to the extent that the court had authority to proceed to the merits. At the least, the allegations show that demand upon the directors or stockholders would be futile. Cathedral Estates, Inc. v. Taft Realty Corp., 2 Cir., 1955, 228 F.2d 85, 88; 3 Moore, Federal Practice, § 23.19, p. 3525.

3. *Claimed disqualification of appellees' counsel.*

■ In appellants' "application for relief from misuse of court process obtained by fraud," in the answer and counterclaim filed by appellant Janney, in appellants' August 30, 1961 motion to quash notice of taking deposition, in their similar motion of October 20, 1961, in their March 26, 1962 motion to remove receiver and for other relief, and in their April 27, 1962 objections to the receiver's account, appellants asserted that appellees' counsel were disqualified by reason of their having been employed by appellants Janney and Pioche to represent Pioche in the Fidelity case. However, there is no paper in the file in action No. 311 in which appellants directly sought, in advance of trial, to have the court enjoin the attorneys from representing appellees, or to stay all proceedings by reason of the alleged disqualification, or to dismiss the action on that ground. Perhaps, by stretching language, the "application for relief from misuse of court process" can be construed as requesting some such relief. It was denied. Conflicting affidavits were filed. The court was not bound to believe those of appellants, and obviously did not.

The record indicates that present counsel for appellees were brought into the Fidelity matter (see Pioche Mines Consol., Inc. v. Fidelity-Philadelphia Trust Co., 9 Cir., 1953, 202 F.2d 944; Pioche Mines Consol., Inc. v. Fidelity-Philadelphia Trust Co., 9 Cir., 1953, 206 F.2d 336; Pioche Mines Consol., Inc. v. Foley, 9 Cir., 1956, 237 F.2d 164) by appellant Janney and appellee Dolman, who were then friendly and working together. At that time there was pending only a counterclaim by Pioche against the trust company. After some consultation, an amended counterclaim was filed, signed by those counsel and others. Thereafter, counsel and Janney disagreed about compensation, and counsel ceased to represent the counterclaimant. The papers in the record contain assertions that, in the course of conferences in reference to the Fidelity case, these counsel obtained confidential information useful to them in actions Nos. 310 and 311. This is denied by counsel. We might feel that, if we were counsel, we would not have participated in the present litigation, lest there be some such contention made, however baseless it might be. We cannot, however, say that the record made by

---

4. As to the propriety of considering the affidavit, see Lucking v. Delano, 6 Cir., 1942, 129 F.2d 283.

appellants requires the conclusion, as a matter of law, that counsel should be forbidden to participate. We have examined the counterclaim in the Fidelity case, which is in the transcript, and we find that the issues there are quite different from the issues here. The information needed to enable counsel to draw that counterclaim would not necessarily be useful to counsel in prosecuting actions Nos. 310 and 311 here involved. The same can be said of another action, the Callahan case, in which it is claimed that these counsel at one time represented Ely. We cannot say, assuming the point to have been properly raised, that the court erred in permitting counsel to proceed.

### B. *The entry of default.*

One of the appellants' principal contentions is that the court erred in entering their default. Appeals Nos. 1, 2 and 9 relate to this default. It is more than doubtful whether the November 1 and 2 minute order and formal order are appealable, a question that we need not consider, since the propriety of these orders can obviously be considered in the appeal from the judgment (No. 9). The default was entered pursuant to Rule 37 (d), F.R.Civ.P., for Janney's contumacious refusal to appear and testify at a properly noticed deposition.

It will be recalled that notices of intent to take his deposition were served on October 19, 1960, (as president of each of the two corporations), on August 16, 1961 (capacity not specified—by then he had appeared, answered and counterclaimed), and on October 6, 1961. As to each of the two latter notices, a motion to quash was filed. In June, 1961, the court quashed the first notice without opposition by appellees, because the court wanted a fresh start. For the same reason, and at the same time, it denied appellees' motion to enter the default of the corporations. That motion was based upon Janney's failure to appear in response to the first notice, but was not pressed. The motion to quash the second notice was not acted upon, and again

Janney did not appear. When the motion to quash the third notice was filed, counsel for appellants wrote to the judge, calling attention to the fact that the deposition was noticed to be taken at the courthouse, and suggesting that the motion to quash be heard at the time for which the deposition was noticed. The judge replied that he would expect Janney to appear, but Janney did not appear, although his counsel had told him about the notice and about the judge's letter.

In response to an inquiry, counsel stated that Janney was "not available" and would not be there, on the ground that he was advised by counsel that he need not appear because the motion to quash was on file. Rule 30(b), F.R.Civ.P. was cited. Appellees' counsel then asked leave to file a motion for default judgment.

The court allowed the filing, declined to consider that motion or the motion to quash at that time, but did begin an inquiry as to why Janney did not appear. Appellees' counsel suggested the issuance of a bench warrant, and the court then decided to consider the motion to quash as well. It treated the prior motion to quash as also before it, most of the grounds urged in both motions being similar. Insofar as the motions were based on the three grounds discussed in this opinion under the heading "Threshold Contentions," the court denied them. This was not error.

The court then considered the claim that Janney's health would not permit his appearance. The court inquired of Janney's two counsel as to Janney's whereabouts. Each replied: "I am not sure." The court indicated that poor health was the only possible meritorious ground for not requiring Janney to depose forthwith. It obviously, and properly, was in doubt as to whether the claimed disability was genuine. Counsel for Janney conceded that his physical condition would not prevent his coming to Las Vegas to be examined. The court therefore ordered that Janney appear at 2:00 o'clock the next day for a physical examination, at appellees' expense, by two doctors to

be selected from lists to be submitted by each side. The order provided that if either side should not submit a list, it was to be deemed to have waived its right to do so, and to be satisfied with the doctors submitted by the other side. The court indicated that if Janney did not submit to the examination, it would grant appellees' motion for his default. Janney's counsel did not designate any doctors, and the court chose two designated by appellees. The court then signed a written order.

The next day the following colloquy occurred:

"COURT: How are we getting along with Mr. Janney's deposition?

"MR. HORTON: [of counsel for Janney] We are not.

"COURT: Is he going to come here today?

"MR. HORTON: No, Your Honor.

"COURT: He is not coming?

"MR. HORTON: No."

\* \* \* \* \* \*

"COURT: I would like to.find out what Mr. Janney is going to do about these depositions. You better get him over here at two—you still have time.

"MR. HORTON: If Your Honor please, if I might tell you what I can tell you about this at this particular time—last night I called Mr. Calhoun, [secretary of Pioche] in Pioche and he advised me that he took Mr. Janney to Caliente on Tuesday—that would be a week ago yesterday, to see Dr. Dills who recommended that Mr. Janney go away somewhere and take a rest where he would not be disturbed \* \* \*."

\* \* \* \* \* \*

"MR. WILKES: [of counsel for Janney] Mr. Calhoun's message was to me that Mr. Janney was advised by his doctor to seclude himself for a period of rest; that he was in bad condition. So far as I know, Your Honor, none of us know where he is actually at the present time."

Horton did not correct this statement.

"COURT: I see—anything else?

"MR. HORTON: I talked to Dr. Dills who confirmed he had told Mr. Janney that he ought to get away where he could be relieved from tension. This was also last night.

"COURT: Who is Dr. Dills?

"MR. HORTON: He is a physician in Caliente, Nevada, Your Honor, and from one of the two of them, there was some mention made of a week or ten days—I don't recall."

After further questioning of counsel, and discussion of the possibility of issuing a bench warrant, the court recessed until 2:30 o'clock to reconsider the matter.

When the court reconvened appellees' counsel suggested that one of Janney's counsel, Horton, be required to take the stand. He testified:

"Q Mr. Horton, would you tell us, please, when the last time was you talked to Mr. Janney?

"A I talked to Mr. Janney last night on the telephone.

"Q Where was he at that time?

"A The call was placed to the residence of a man named Williams in Houston, Texas."

\* \* \* \* \* \*

"COURT: Where was that, from where?

"A At the residence of a man named Williams in Houston, Texas."

\* \* \* \* \* \*

"Q When you spoke to Mr. Janney last night, did he indicate any intention of returning for the purpose of taking the deposition, having the deposition taken in Civil Action 311?

"A He indicated an intention of returning; it was not a question of his returning for the appearance today.

"Q Did he indicate that he would submit himself to the taking of the deposition in Civil 311?

"A I did not ask him directly that question.

"Q Has he ever indicated an intention of submitting himself for the taking of his deposition in action 311?

"A Under proper circumstances, he has.

"Q Well, will you tell us what those circumstances are that Mr. Janney has indicated he will submit himself for the taking of his deposition in Civil Action 311?

"A Insofar as the matter was discussed with him and the particular circumstances enumerated, these would include the granting of appropriate relief under Rule 30(b)."

\*　　\*　　\*　　\*　　\*　　\*

"A His communication to me, as I recollect it, with regard to submitting to an examination had to do with the appropriateness of relief under Rule 30, that would include staying of the deposition, that would include an order that the deposition be taken in Pioche, rather than in Las Vegas; that would include the granting of relief that we have asked this Court to give us pursuant to the timely motion, that would expose the present plaintiffs as abusing the processes of the Court—for the purpose of backing up extortionate demands and for the disqualification of the attorneys that had served the notice on the ground of prior retainer. Those are what I recall of the grounds that are involved under Rule 30(b)."

\*　　\*　　\*　　\*　　\*　　\*

"Q All right. Last night did you tell Mr. Janney he was ordered by the Court to appear here today for physical examination by the doctors in Las Vegas?"

\*　　\*　　\*　　\*　　\*　　\*

"A Yes.

"Q Did he indicate he would so appear or that he would attempt to appear?

"A He indicated that he could not appear.

"Q That he could not?

"A That is right.

"Q Why could he not appear?

"A Lack of adequate notice and—

"Q Well, he was physically able to travel to Texas, apparently, is that correct?

"A He was not able to come on a half-day's notice from Houston, Texas, to Las Vegas, Nevada.

"Q. Did he make any attempt to obey the Court's Order to appear here today?

"A You would have to ask him.

"Q I am asking you if you know if he made any attempts to appear here.

"A Yes.

"Q As far as you know, Mr. Horton, did Mr. Janney make any attempt to come here in response to the Court's Order of yesterday.

"A Not as far as I know.

"Q Is he enroute here now, so far as you know?

"A Not so far as I know.

"Q Is he planning on staying in Houston, Texas, so far as you know?

"A I am not certain of his plans.

"Q Didn't he tell you what his plans were when you talked to him?

"A He indicated he would return here in a week.

"Q Pardon?

"A He indicated that he would return in a week.

"Q Return to Las Vegas or Pioche?

"A Return to Nevada.

"Q Did he indicate whether he would return to Pioche or to Las Vegas?

"A I understood him to mean that he would return to Pioche.

"Q When you talked to Mr. Janney last night on the telephone did he appear rational?

"A Yes.

"Q Coherent, logical, in command of his faculties?

"A He appeared to me to be, yes." Following the close of testimony, the following colloquy between court and counsel occurred:

"COURT: Let me ask you this— let me ask you this, if I defer acting on this until tomorrow morning or tomorrow afternoon, will you have Mr. Janney here tomorrow morning, here at ten o'clock?

"MR. HORTON: I don't know, Your Honor."

\* \* \* \* \* \*

"MR. HORTON: He says the abstention of tension or—

"COURT: Would hurt him—I don't think you would produce him here if I gave you an opportunity to produce him. You wouldn't do it.

"MR. HORTON: Under the circumstances of this case, I wouldn't recommend to him that he come."

After further argument, the court ordered Janney's pleadings stricken, and his default entered.

Neither in his written motion to set aside the default, nor in the oral presentation of it, did Janney or his counsel offer his appearance for a deposition if the default were set aside. So far as this record shows, he is still unwilling to depose. Counsel's position has continuously been that he was under no duty to do so.

▉ Counsel's view seems to be that a party need not appear if a motion under Rule 30(b), F.R.Civ.P. is on file, even though it has not been acted upon. Any such rule would be an intolerable clog upon the discovery process. Rule 30(b) places the burden on the proposed deponent to get an order, not just to make a motion. And if there is not time to have his motion heard, the least that he can be expected to do is to get an order postponing the time of the deposition until his motion can be heard. He might also appear and seek to adjourn the deposition until an order can be obtained. (Rule 30(d)). But unless he has obtained a court order that postpones or dispenses with his duty to appear, that duty remains. Otherwise, as this case shows, a proposed deponent, by merely filing motions under Rule 30(b), could evade giving his deposition indefinitely. Under the Rules, it is for the court, not the deponent or his counsel, to relieve him of the duty to appear.

Nor did the peculiar rule of the local court, relating to motions, excuse him. That rule (Rule 7), indicates that ordinarily an oral hearing on a motion will not be held, but the motion will be decided upon the papers on file. It further provides that if opposition to the motion is not filed, this is deemed a consent to the granting of the motion. Here, opposition was filed, appellants' counsel requested a hearing, and the court, in reply, stated that Janney was to appear.

▉ It is clear that the failure to appear was willful. It was not merely intentional; it was a direct flaunting of the authority of the court. It was conditional upon the court's granting relief that it had discretion to deny. No court is required to tolerate such deliberate defiance of its authority.

We are aware that the fifth amendment to the Constitution sets limits upon the authority conferred upon the court by Rule 37(d). See Societe Internationale, etc. v. Rogers, 1958, 357 U.S. 197, 208–210, 78 S.Ct. 1087, 2 L.Ed.2d 1255. But we can find no deprivation of due process here. The court kept the door open until it became very clear that Janney would depose only upon his own terms, regardless of what the court's terms might be. Rule 37(d) advised him of the consequences. The court did not abuse its discretion, either in ordering the default of Janney or in refusing to set it aside. (See Collins v. Wayland, 9 Cir., 1944, 139 F.2d 677)

We have thought it appropriate to burden this already lengthy opinion with quotation from the record because we think it well illustrates the pattern of evasion and obstruction, indeed open defiance, with which appellant Janney and his counsel met every effort of appellees and the trial court to secure his deposi-

tion. We endorse the sentiments of the many courts which have viewed the disposition of important interests by default judgment as an unsatisfactory substitute for a full hearing on the merits (e. g., Gill v. Stolow, 2 Cir., 1957, 240 F.2d 669). We agree that a party should be deprived of his day in court only upon a strong showing of willful disobedience of court process. In this case, however, the portion of the record quoted above is but one sample of persistent conduct by appellant Janney which the trial court found to be willful. We think that finding not only well supported, but virtually inescapable.

■ The court did err, however, in ordering the default of the corporations. Appellees' counsel expressly stated that their motion was directed solely to the striking of Janney's pleadings and the entry of his default, and that he was not asking for such relief against the corporations. Nevertheless, the order that counsel prepared, and that the court signed, orders that the defendants' pleadings be stricken, and their default entered. The judgment is to the same effect. We think that, while Rule 37(d) gave the court authority to enter the default, it should not have done so, as to the corporations, when such relief was not sought. The rule itself provides for a motion and notice, and counsel made it clear, when the motion was heard, that his motion was not aimed at the corporations.

When this discrepancy between the motion and the resulting order was called to the court's attention, it declined to change it, apparently accepting the representation of appellees' counsel that default of the corporations was technical only, since they were nominal defendants against which no relief was sought. This view, however, failed to take account of the motion to appoint a receiver over the corporations. Moreover, in striking the pleadings of the corporations, the trial court struck counterclaims by which the corporations had asserted claims for relief against plaintiff Dolman. We con-

sider at a later point the significance of this error.

C. *The money judgment against Janney.*

■ Beginning on November 15, 1961 and continuing until December 15, 1961, the court took testimony, pursuant to Rule 55(b) (2), F.R.Civ.P. to determine the amount of damages to be awarded against Janney. This was based upon the second "cause of action" stated in the amended complaint which charged that he had diverted corporate assets to his own use, to an extent that "exceeds the sum of $1,000,000." While this is a rather sketchy pleading, we think it sufficient, under Rule 8(a) and (e), F.R. Civ.P., to permit the court to proceed. No motion for a more definite statement (Rule 12(e)) was made.

On this issue, the findings are as follows:

"One of the principal assets of defendant Pioche Mines Consolidated, Inc. was that certain mine commonly known as the Ely Valley Mine located at Pioche, Nevada. Said corporation expended substantial amounts of money upon said mine.

"On numerous occasions defendant John Janney reported, in writing, to stockholders of said corporation and to investors in said corporations, that said mine was an asset of said corporation.

"While purporting to hold said Ely Valley Mine in trust for the benefit of the stockholders of Pioche Mines Consolidated, Inc., the said John Janney wrongfully converted the said mine for his own uses and purposes to the detriment of the stockholders of said corporation.

"As a result of said wrongful conversion of said Ely Valley Mine, net profits from the operation of said mine in excess of the sum of One Million Dollars ($1,000,000.00) were wrongfully used by the said John Janney, for his own purposes, which were not for the benefit of defendant

Pioche Mines Consolidated, Inc., nor the stockholders thereof.

"Innocent third parties have subsequently acquired interests in the said Ely Valley Mine which prevent the return of said mine to defendant corporation Pioche Mines Consolidated, Inc.

"At all times involved herein, defendant John Janney wrongfully concealed, without cause, the true facts concerning his wrongful misappropriation of the said Ely Valley Mine from the stockholders of defendant corporation Pioche Mines Consolidated, Inc., and purported to hold the said mine for the benefit of the stockholders of said corporation. At no time prior to the commencement of this action did the said John Janney repudiate his claim that his holding of Ely Valley Mine was for the benefit of the stockholders of Pioche Mines Consolidated, Inc. At no time prior to the commencement of this action did any of the stockholders of said corporation know, nor are they chargeable with constructive knowledge thereof, of the wrongful conversion by the said John Janney of the said mine, and the proceeds thereof.

"By reason of the foregoing, the stockholders of Pioche Mines Consolidated, Inc., exclusive of stockholder John Janney, have been damaged by the said John Janney in an amount in excess of One Million Dollars ($1,000,000.00)."

The time of the conversion is stated by appellees to be 1949, and the act of conversion the transfer of the mine to appellant Ely.

Appellants strenuously argue that the evidence does not support the findings. Their principal contention is that the Ely Valley Mine has always been the property of Janney, and never belonged to Pioche or its predecessor, Pioche Mines Company, and that therefore it could not have been an asset of Pioche, or, as such, converted by Janney.

The evidence that is claimed by appellees to support the findings is largely documentary, coming principally from the records of Pioche and Pioche Mines. It is not disputed that legal title to the mine was in Janney until 1939, when it was placed in the so-called "Ford trust." But there are a number of papers in the record in which it is asserted, by Pioche Mines Company or Janney, that the mine was an asset of that company. This was promotional material for the corporation, and Janney was president, a stockholder, and a principal promoter. It was also shown that, when Pioche was formed to take over the assets of Pioche Mines Company, and certain others, the literature sent to stockholders, who had theretofore been told that the mine was an asset of Pioche Mines Company, did not tell them that it was *not* to be an asset of Pioche, thus leading to the inference that it would be.

Accounting records of Pioche were introduced, showing considerable expenditures by it on the mine. There is also material, issued after the incorporation of Pioche, indicating that the mine was one of its assets. We think that the court could infer, as it did, that the beneficial ownership was in Pioche, even though, because of the informal manner in which the business was conducted by Janney, dry legal title remained in Janney. If the promoter of a corporation who holds title to an asset represents to the public at large, including the stockholders, that the asset belongs to the corporation, we think that the court can take him at his word. Janney attempted to explain this evidence away, but the court was not bound to, and did not, accept the explanation.

In 1939, Janney conveyed the mine, in trust, to one Ford. The conveyance was expressly for the benefit of the stockholders of Pioche, and bears the earmarks of a fraudulent conveyance designed to insulate the mine from the claims of parties engaged in litigation with Pioche, while permitting the use of the mine to obtain funds to fight the litigation. Janney explains it as an attempt by him per-

sonally to provide funds by the use of an asset of his own, for the same purpose. Again, the court was not required to believe him.

In 1949, the trust was terminated and the mine conveyed to Ely. This is the conversion relied upon. It will be noted, however, that the judgment is not based upon a finding as to the value of the mine. The finding is that net profits from operating the mine were not paid over to Pioche. It is urged that this finding is not supported. The finding is based on a statement, issued by Janney as president of Ely, showing moneys received and paid out to December 31, 1950. This does show "net from operations" of $1,049,728.86. The statement shows where the money went, and none of it went to Pioche, except a loan of $56,162.72. The latter would have no significance if the moneys loaned were in fact Pioche's money. The moneys were used for mine development, buildings, machinery and equipment, and to purchase interests in other properties. But none of these went to Pioche either. The judgment, insofar as it relates to Pioche, is supported.

However, no attempt was made to show any damage whatever to Ely, and none is found by the court.

D. *The Receivership.*

■ We have concluded that it was error to appoint a receiver for the two appellant corporations, for several reasons.[5]

First, the prayer of the complaint is insufficient to permit the appointment on a default. The prayer, so far as material, is as follows:

"4. That said corporations, and each of them, and the said JOHN JANNEY, be restrained from exercising any control or entering into any transaction with regard to the said corporations, until further order of this Court."

We think that a receivership is so different from an injunction that this can hardly be held to give notice to appellees that a receivership would be sought. (See Pueblo Trading Co. v. El Camino Irr. Dist., 9 Cir., 1948, 169 F.2d 312)

Second, as we have already held, it was error to enter the default of the two corporations. The default of Janney alone would not justify a default receivership of the corporations. His sole interest in that question would be in his capacities as president of and as a stockholder in each. The corporations were entitled to contest the application, and this right was not accorded to them. Not every receivership is beneficial to a corporation. There is always expense involved. Sometimes a receivership results in insolvency. Thus they were prejudiced by the entry of their defaults.

■ Third, we do not think that a receivership would be proper in this case in any event. Receivership is an ancillary remedy, and the substantive relief here sought does not justify its use. The only claims for substantive relief stated in the amended complaint are two. One is that the court should see that certain taxes be paid upon undesignated real properties. This has been done, and the matter is moot. The other is for $1,000,000, on behalf of the corporations and against Janney. This has been awarded, as to Pioche. The only ancillary relief asked is the injunction referred to in the portion of the prayer quoted above. A receivership is not an end in itself; it is but a means to an end. Here no end was sought. Under the judgment, none is in sight.

There is a charge that Janney controls the corporations and their boards of directors, and has abandoned them and

---

5. Appeals Nos. 3, 4, 5 and 7 relate to the appointment of the receiver. Nos. 3 and 4 appear to be premature. They also relate to orders that were clearly interlocutory. No. 5 relates to the actual appointment, and No. 7 to denial of motions to remove the receiver and to stay the order appointing. No. 9, the appeal from the judgment, also relates to the receivership, which is ordered continued in effect. These appeals, except Nos. 3 and 4, are properly before us under either section 1292(a) (2) or section 1291, 28 U.S.C.

their properties, and that he has profited at their expense. But for all that appears, upon termination of his control by an injunction, or even without it, the stockholders would be able to meet, elect new boards of directors, and conduct the affairs of the corporations as they deem best. Nothing in the complaint indicates that they would not. In this respect, the motion for the appointment of a receiver, filed as a part of the motion for default judgment, adds little. It indicates that plaintiff Dolman has obtained a list of stockholders, has ascertained the addresses of many of them, and holds their proxies. For all that appears, they can control the corporations.

Both are Nevada corporations, and the law of Nevada provides ample means for rectifying the situation portrayed by the complaint and the affidavits. (See e. g., Nevada Revised Statutes, §§ 78.335; 78.-345; 78.600; 78.630; 78.635–78.645; 78.650–78.715) Appellees did not at any time claim to base their complaint upon any of these statutes. We need not decide whether, in a diversity case, a federal court could take jurisdiction of an action grounded upon any of these statutes. We presume that it could. This is not such an action.

Nor need we decide whether, in dealing with a request for a receivership in a diversity case, the court must apply state or federal law. If the applicable law be federal, on the theory that the relief is "ancillary," and the matter is "procedural," granting the relief here would be improper. Gordon v. Washington, 1935, 295 U.S. 30, 55 S.Ct. 584, 79 L.Ed. 1282. It seems probable, however, that the applicable law is that of Nevada. See: Guaranty Trust Co. v. York, 1945, 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079; Kohler v. McClellan, 5 Cir., 1946, 156 F.2d 908; Mintzer v. Arthur L. Wright & Co., 3 Cir., 1959, 263 F.2d 823; Moore, Federal Practice, §§ 2.09, 66.05; Note, 67 Harv.L.Rev. 836 (1954); but see 1 Clark, Receivers § 144(c), p. 232, (3d ed. 1959); compare Byrd v. Blue

Ridge Elec. Corp., 1956, 356 U.S. 525, 78 S.Ct. 893, 2 L.Ed.2d 953.

If Nevada law be applied, the result is the same, because appellees have not brought themselves within the terms of the applicable Nevada statutes, particularly Nev.Rev.Stat. §§ 78.650–78.715. That they would be required to do so is indicated by Cohen v. Beneficial Indus. Loan Corp., 1949, 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528. See, also, Shelton v. Second Judicial Dist. Court, 1947, 64 Nev. 487, 185 P.2d 320, and compare International Life Underwriters v. Second Judicial Dist. Court, 1941, 61 Nev. 42, 113 P.2d 616, 115 P.2d 932.

The orders appointing the receiver, and the portion of the judgment that continues the appointment, must be reversed. The receiver must be required to account and to deliver the properties of the respective corporations to them, and be then discharged. (See Brictson Mfg. Co. v. Close, 8 Cir., 1922, 280 F. 297, 301)

E. *The Injunction.*

The court, by minute order of December 6, 1961, ordered the issuance of a temporary restraining order. This was embodied in a formal order on January 24, 1962. The order provides:

"IT IS HEREBY ORDERED that the abovementioned defendants, and each of them, are hereby restrained from disposing of any and all assets, including moneys, of the abovementioned defendant corporations until further order of this Court;"

The court did not require a bond as provided in Rule 65(c) F.R.Civ.P. The order appointing the receiver, of March 16, 1962, also contains an injunctive provision as follows:

"IT IS FURTHER ORDERED that said defendant corporations, their officers, managers and agents, are restrained from disposing of, transferring or removing any of their assets, properties, books, files, records and accounts, and they and each of them and all other parties

having property in their possession or under their control belonging to said corporations are hereby directed to deliver the same to said receiver."

It requires a receiver's bond of $150,000. The first order fails utterly to comply with Rule 65(d); the second complies. The bond, however, is not the customary form of bond issued when an injunction is obtained (Rule 65(c)).

The judgment contains the following injunctive provisions:

"Said defendant corporations, their officers, managers and agents, are restrained from disposing of, transferring, or removing any of the assets, properties, books, files, records and accounts of said corporations, and they and each of them and all other parties having property in their possession or under their control belonging to the said corporations are hereby directed to deliver the same to said Receiver.

"Defendant John Janney is hereby restrained from disposing of or otherwise hypothecating his stock in the following corporations: Pioche Mines Consolidated, Inc., Ely Valley Mines, Inc., Pioche Power & Light Company."

Appeals Nos. 4, 5, 7 and 9 relate to these matters.

▉ The order of January 24, 1962 must be reversed for failure to comply with Rule 65(d). The order of March 16, 1962 must be reversed because it is in aid of the receivership, as to which it is also being reversed.

▉ The judgment, insofar as it enjoins anyone other than Janney, must also be reversed, because of the error in entering the default of the corporations. As it relates to Janney, it must be reversed insofar as it enjoins him from disposing of his stocks. There is no finding that these stocks were wrongfully acquired by him, or that any person other than Janney has any interest in them. See Monte Rico Min. & Mill. Co. v. Fleming, 8 Cir., 1919, 258 F. 106: "The right of a stockholder to sell and transfer his stock is one of the commonest incidents." (258 F. at 108)

▉ Insofar as the judgment enjoins Janney from disposing of any of the corporate assets, it should be affirmed. There are findings that he has wrongfully done so, as to Pioche, and findings that he has failed in many of his obligations as an officer and director of both corporations. See Monte Rico Min. & Mill. Co. v. Fleming, supra.

F. *The Expenses of Suit.*

The judgment awards appellee Dolman $46,457.90 as expenses incurred or paid by her in prosecuting the action and $75,000.00 as compensation for her services. It also awards her counsel a total of $215,000.00. All of these sums are to be paid out of the $1,000,000.00 that Pioche is to recover from Janney.

No moneys have been recovered on behalf of Ely. The recovery on behalf of Pioche is for wrongs occurring long before Dolman became a stockholder on November 23, 1955. Thus, under Rule 23(b), F.R.Civ.P., Dolman had no standing to prosecute the action in relation to those wrongs. It was only because she and her counsel brought in other stockholders who were such at the time of the wrongs that the court could proceed to judgment against Janney. The record also shows that the other stockholders were brought in by Dolman and her counsel upon the express representation and understanding that there would be no expense to them.

▉ While we have been cited to no authority on the question, and have found none, we think that to allow these portions of the judgment to stand would encourage a too easy avoidance of Rule 23(b). Our holding in this case that the court could properly proceed after the additional stockholders were brought in goes far enough. It does not follow that the single stockholder who instituted the action, but did not have standing to complain of the wrongs on which the judgment is based, should recover her expenses, including her attorneys' fees, much

less that she should be paid for her efforts.[6] We think that her time and expense should be charged to her. Both she and her counsel knew when she acquired her stock, and the matter of her standing to bring the action was raised in the corporations' answer as early as April 4, 1960. Apparently, counsel either failed to read Rule 23(b) or elected to disregard it when they drew the complaint.

The award of counsel fees stands on a somewhat different footing. (See Hornstein, The Counsel Fee in Stockholders' Derivative Suits, 39 Colum.L.Rev. 784, 811–12) As is there pointed out, the corporation benefits from counsels' efforts, and often the stockholder plaintiffs do no more than lend their names. This may not be true of Dolman, but it is true of the other plaintiffs, who joined in the amended complaint.

We think that counsel are no more entitled to compensation for that part of their efforts that occurred when Dolman was their sole client than is Dolman herself. We also think, however, that the court can allow them compensation for that part of their efforts in obtaining the $1,000,000.00 judgment that occurred after the amended complaint was filed on June 6, 1961. At that point, as we have held, Rule 23(b) was complied with.

The court has already determined that the value of the services rendered by counsel, from May of 1958 to the date of judgment (October 8, 1962) is a total of $200,000 for one firm and $18,529.19 for local counsel. We do not disturb this finding. But we hold that only a portion of these sums should be paid out of the funds recovered for Pioche, namely, the portion that represents the value of services rendered on and after June 6, 1961. As to services rendered before that date, counsel must look to their client for payment.

We think it proper that judgment run in their favor. (See Hutchinson Box Board & Paper Co. v. Van Horn, 8 Cir., 1924, 299 F. 424, 426; Angoff v. Goldfine, 1 Cir., 1959, 270 F.2d 185.) Perhaps, in theory, the judgment for counsel fees should be in favor of their clients, who employed them. But in a very practical sense, counsel acted for the corporation, and therefore they should be paid direct, out of what they recover. They should not, however, be paid in full before any money goes to the corporation. Until collected, the judgment is but a paper, and counsel and the corporation should share, ratably, such sums as are in fact collected. The portions of the judgment awarding moneys for expenses, compensation, and attorneys' fees must be reversed in part and remanded.

G. *The Form of the Judgment.*

 The judgment awards the receiver $1,000,000.00 against Janney, "for the benefit of Pioche Mines Consolidated, Inc. stockholders," exclusive of Janney. It further directs that moneys collected be paid direct to the stockholders of Pioche, exclusive of Janney and of any other stockholders whom the court may hereafter designate.

This is error. Pioche is still an existing corporation, and the judgment belongs to it. (19 C.J.S. Corporations § 833d, pp. 254–255) Moreover, its creditors, if any, have rights against its assets that are superior to those of its shareholders. The judgment also confiscates a portion of the value of Janney's stock, which, so far as the record shows, is lawfully issued and outstanding. Its effect is to give his fellow shareholders a double recovery against him. We know of no rule of law or equity that supports this result. In these respects, the judgment must be reversed.

H. *The Orders Instructing the Receiver.*

Appeals Nos. 5 and 8 bring before us two orders instructing the receiver (28 U.S.C. § 1292(a) (2)). The first is the

---

6. We do not decide whether it is ever proper to award compensation, as distinguished from expenses, to one who successfully prosecutes a stockholders' derivative suit.

**276**

ex parte order of March 20, 1962. It authorizes the receiver:

1. To employ counsel for Dolman as his counsel, on terms to be determined by the court.

2. To close the office of the corporations at Pioche and open an office at Las Vegas.

3. To employ a watchman at Pioche.

4. To open a checking account.

5. To advance $6,500 of his own funds, and issue to himself a receiver's certificate in that amount.

6. To pay a number of expenses:

(a) $300 per month for watchman.

(b) $100 per month for office overhead.

(c) Insurance premiums, in an amount to be determined.

(d) $1500 premium on his bond.

(e) $3500 to his attorneys for costs to be incurred in the Fidelity case.

(f) Up to $260 for expenses in preparing an inventory.

(g) Up to $500 for his travel and other incidental expenses.

7. To terminate any present employee of the corporations.

8. To take physical possession of all corporate assets.

The second is the order of May 24, 1962. This orders the receiver to take charge of the prosecution of the counterclaim of Pioche in the Fidelity case and for that purpose to retain counsel for Dolman. It restrains Janney and his attorneys from interfering with the receiver in so doing, and requires that they turn over to him all papers and evidence relating to the matter. It further authorizes the receiver to issue certificates, upon terms later to be authorized, and to use funds thus raised to pay the expenses of the litigation. The order expressly recognizes the right of Janney and his counsel to participate in the trial, "in cooperation with the Receiver and Intervenor [Dolman] and their counsel."

Since we hold that the appointment of a receiver was erroneous, these orders must be vacated. This does not, however, mean that none of the expenses authorized can be charged against Pioche or Ely. In effecting the final discharge of the receiver, the court must have a full accounting by him, upon notice and hearing. (W. F. Potts Son v. Cochrane, 5 Cir., 1932, 59 F.2d 375). The receiver is not personally liable for acts done by him within the scope of the authority conferred upon him by the court. (16 Fletcher, Cyclopedia of Corporations, § 7864, p. 498 (Rev. ed. 1962)) Mr. Clark thinks that, although the receiver's appointment be erroneous, all costs of the receivership may properly be charged against the corporation's funds. (2 Clark, Receivers § 637.1(m), p. 1065) Here, at least, we think not. The court has a discretion to charge the receiver's expenses either to the corporation or to the party who wrongfully obtained the receiver's appointment. (Burnrite Coal Briquette Co. v. Riggs, 1927, 274 U.S. 208, 47 S.Ct. 578, 71 L.Ed. 1002).

The discretion of the court is to be exercised according to the justice and equity of each case. Fulp v. McCray, 8 Cir., 1927, 21 F.2d 951, 952. We think that Judge Hutcheson has well stated the rule that should be applied here. In W. F. Potts Son v. Cochrane, supra, he holds that those costs of the receivership that would not have arisen but for the appointment should be charged against the party invoking the receivership, here the appellees. On the other hand, expenses that the corporation would have had to incur had there been no receiver, and expenses that confer a genuine benefit upon the corporation, should be charged to it. Here, the court has found that the appellees have acted in good faith, and we therefore think that the principles stated by Judge Hutcheson should be applied in this case.

In No. 17,709, it is ordered that:

1. Appeal No. 1, of November 6, 1961, appeal No. 2, of December 18, 1961.

appeal No. 3, of January 4, 1962, and appeal No. 4 of February 5, 1962, are dismissed.

2. Insofar as the judgment awards $1,000,000.00 and costs against John Janney, it is affirmed; insofar as that judgment is in favor of the receiver, it is reversed, and the court is directed to substitute Pioche Mines Consolidated, Inc. a corporation, as the party in whose favor that part of the judgment is entered.

3. The judgment against Pioche Mines Consolidated, Inc. and Ely Valley Mines, Inc. is reversed.

4. The order entering the defaults of those two corporations and striking their pleadings is reversed. The court is directed to reinstate their counterclaims.

5. The orders of December 16, 1961, January 24, 1962, and March 16, 1962, and the judgment, insofar as they direct the appointment of, or appoint the receiver, are reversed.

6. The orders of December 6, 1961, January 24, 1962, and March 16, 1962, insofar as they contain injunctive provisions, are reversed.

7. The judgment, insofar as it contains injunctive provisions against anyone other than appellant John Janney, his agents, servants, or employees, is reversed.

8. That part of the judgment which restrains John Janney from disposing of or otherwise hypothecating his stock in Pioche Mines Consolidated, Inc., Ely Valley Mines, Inc., and Pioche Power & Light Company, is reversed.

9. That part of the judgment which restrains John Janney and his agents from disposing of, transferring or removing any of the assets, properties, books, files, records and accounts of Pioche Mines Consolidated, Inc. or of Ely Valley Mines, Inc., is affirmed.

10. Subparagraph 1 and 2 of paragraph VIII of the judgment are reversed. Subparagraphs 3, 4, 5 and 6 of paragraph VIII are reversed and remanded. The court is directed to determine what portion of the services of the firm of Sullivan, Roche, Johnson & Farraher and Gerald O'Connor, Esq., and of Alvin N. Wartman, Esq., were rendered on and after June 6, 1961, and award to the firm a judgment for a corresponding portion of the sum of $200,000 and to Alvin N. Wartman a judgment for a corresponding fraction of $18,-529.19, such judgments to be payable only out of the $1,000,000 recovered by Pioche from Janney, and only from sums actually collected in the proportion that the sums awarded to such attorneys, respectively, bear to the total recovery adjudged due to Pioche from Janney.

11. Plaintiffs may recover their taxable costs in the trial court from appellant John Janney, but no other costs or expenses.

12. The orders of March 20, 1962, and of May 24, 1962, instructing the receiver, are vacated.

13. The matter is remanded to the trial court with directions

　a. To modify the judgment in the manner hereinabove ordered.

　b. To enter a judgment that plaintiffs take nothing against Ely Valley Mines, Inc., or on its behalf, other than the portion of the injunction awarded against John Janney personally that is hereby affirmed, that the action be dismissed as against Ely Valley Mines, Inc., and that it recover its taxable costs in the trial court against plaintiffs.

　c. To vacate the appointment of the receiver, require him to account, settle his accounts in the manner herein approved,

charge expenses of the receivership against such parties as may be appropriate under the principles stated in this opinion, require the receiver to deliver the respective properties, books, files, records and accounts of Pioche Mines Consolidated, Inc. and Ely Valley Mines, Inc., to them, and upon the settlement of his accounts and the completion of his duties, discharge him.

d. To take all other actions necessary to carry out the foregoing orders, and such further proceedings as shall be consistent with this opinion.

14. Appellees are awarded one-half of their costs on appeal against appellant John Janney; otherwise, each party shall bear his, her, or its own costs on appeal.

In No. 18,192, the appeal is dismissed.