**CITY OF TENAKEE SPRINGS, Southeast Alaska Conservation Council, the Sierra Club, the Wilderness Society, Diane Ziel, Dale Ziel, Rudolf Ziel, Molly Kemp, Robert Parish, John M. White, John C. Wisenbaugh, Tobin Rubke, Janice J. Eagle, Glen Lockhart, T.J. Clark, Samuel E. McBeen, Joan M. McBeen, Robert A. Pegues, Lonnie Anderson, Mike Jackson, Samuel Jackson, Thomas Jackson, Norman Jackson, Marvin Kadake, the Organized Village of Kake, Kake Tribal Corporation, Angoon Community Association, and Donald Frank, Plaintiffs,**

**v.**

**Helen CLOUGH, District Ranger, Sitka Ranger District, Tongass National Forest, Joseph A. Chiarella, District Ranger, Hoonah Ranger District, Tongass National Forest, Gary Morrison, Forest Supervisor, Chattham Area, Tongass National Forest, Ron Humphrey, Forest Supervisor, Stikine Area, Tongass National Forest, Michael A. Barton, Regional Forester, Alaska Region, F. Dale**

Robertson, Chief of the United States Forest Service, Clayton Yeutter, Secretary of the United States Department of Agriculture, United States Forest Service, United States Department of Agriculture, Defendants,

and

Alaska Pulp Corporation, an Alaska corporation, and Whitestone Logging, Inc., Intervenors–Defendants.

Sam HANLON, Sr., Individually and on behalf of the Wooshikitaan Clan, Richard Sheakley, Sr., Individually and as Chief of the T'Addeintaan Clan, Victor Bean, Richard Bean, Jr., Ernestine Hanlon, George Westman, and Douglas Glessing, Plaintiffs,

v.

Michael BARTON, in his official capacity as Regional Forester for the Alaska Region, Dale Robertson, in his official capacity as Chief of the United States Forest Service, Clayton Yeutter, in his official capacity as Secretary of Agriculture, and the United States Forest Service, an agency within the Department of Agriculture, Defendants,

and

Alaska Pulp Corporation, Intervenor–Defendant.

No. J86–024 Civil.

United States District Court, D. Alaska.

June 18, 1990.

Eric P. Jorgensen, Thomas S. Waldo, Sierra Club Legal Defense Fund, and Southeast Alaska Conservation Council, Inc., Steven E. Kulick, Juneau, Alaska, for Tenakee plaintiffs.

Vance A. Sanders, Mark Regan, Juneau, Alaska, and Carol Daniel, Joseph Johnson, Alaska Legal Services, Anchorage, Alaska, for Hanlon plaintiffs.

Bruce M. Landon, Land & Natural Resources Div., Dept. of Justice, Anchorage, Alaska, for defendants.

James F. Clark, Mary A. Nordale, Robertson, Monagle & Eastaugh, Juneau, Alaska, for intervenors-defendants.

## MEMORANDUM AND ORDER

VON DER HEYDT, District Judge.

### I. INTRODUCTION.

THIS CAUSE comes before the court on the following motions filed in *City of Tenakee Springs v. Clough* (No. J86–024 Civ.):[1] the motion to amend complaint filed January 8, 1990 (Docket No. 144) by plaintiffs City of Tenakee Springs et al.; plaintiffs' motion for leave to file a second amended complaint filed February 2, 1990 (Docket No. 153); the motion for partial dismissal filed March 7, 1990 (Docket No. 171) by defendants United States Forest Service et al.; the Forest Service's motion to strike exhibits filed February 21, 1990 (Docket No. 163); the motion for preliminary injunction inadvertently lodged with plaintiffs' rejected motion to file overlength brief filed January 8, 1990 (Docket No. 145);[2] and plaintiffs' supplemental motion for preliminary injunction filed February 2, 1990 (Docket No. 154). Plaintiffs' claims

---

1. This court on March 15, 1990, consolidated *Tenakee Springs* with *Hanlon v. Barton*, No. J88–025 Civ., in which there are pending motions to dismiss (Docket No. 48), for preliminary injunction (Docket No. 50), to amend and supplement complaint (Docket No. 51), and to strike cross-references (Docket No. 191). The *Hanlon* plaintiffs on May 18, 1990 (Docket No. 219) filed a motion to supplement preliminary injunction which is not yet ripe for consideration. Accordingly, the court will defer ruling on the *Hanlon* motions until the motion to supplement ripens.

2. The court earlier denied plaintiffs' motion to file a brief which exceeded the 50–page limit by over 50%. *See* L.G.R. 6(K). Plaintiffs resubmitted a conforming brief which, like the original brief, is printed at a nonstandard pitch—15 characters per inch rather than 10 characters per inch. The court will consider the resubmitted brief as well as all other briefs already filed by plaintiffs in this litigation. However, plaintiffs' counsel are notified that the court in the future will not in this or in other litigation consider counsel's moving papers unless they are printed at 10 characters per inch and otherwise conform with the requirements under the local rules. Where counsel indulge every marginally colorable claim or argument their zealous advocacy disserves the interests of justice by diluting debate on more important questions. Plaintiffs' counsel are reminded that when they inundate the court with paper, they also inundate the court's time. It is urged that plaintiffs' counsel retire their shotgun to other uses.

fall within the court's federal question jurisdiction. 28 U.S.C. § 1331. For the reasons set forth below, the parties' motions are denied, except for plaintiffs' motions to amend complaint, which are granted, and the Forest Service's motion to strike exhibits, which is granted in part.

## II. BACKGROUND.

In 1956, the Forest Service and Alaska Lumber and Pulp, now intervenor-defendant Alaska Pulp Company ("APC"), entered into a long-term timber sale contract ("Contract") for logging over a fifty-year period—1961 to 2011—in an area in the Tongass National Forest in southeastern Alaska which includes portions of Baranof, Chichagof, Kuiu, and associated islands. APC Long–Term Timber Sale Contract Final Supplement to the Environmental Impact Statements for the 1981–86 and 1986–90 Operating Periods ("FSEIS"), ch. 1–1. Since 1971, the Service has prepared operating plans for successive five-year periods, supported by environmental impact statements required under the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 et seq. *Id.*

Plaintiffs, a municipality and organizations with resource interests in the sale area, earlier in this litigation challenged the FEIS prepared by the Forest Service for the 1981–86 Operating Period. Before the court decided the merits of those claims, the Service promulgated an EIS and Record of Decision ("ROD") for the 1986–90 period, which plaintiffs appealed to the agency. Subsequently, on June 26, 1987 (Docket No. 75), the court entered its Memorandum and Order identifying deficiencies in the 1981–86 EIS. The parties then reached an interim settlement. Under the settlement, the Forest Service agreed to prepare a Supplemental Environmental Impact Statement ("SEIS") curing the deficiencies in the 1981 FEIS and addressing concerns regarding the 1986 FEIS raised in this and other litigation. The Forest Service issued the FSEIS and ROD for 1986–90 on November 16, 1989, after which the instant motions were filed.

## III. PLAINTIFFS' MOTIONS TO AMEND COMPLAINT.

Plaintiffs in their motion to amend complaint (Docket No. 144) seek to add new claims to those raised in their original complaint filed September 29, 1986. Plaintiffs in their motion for leave to file a second amended complaint (Docket No. 153) seek to join new plaintiffs in the litigation. The Forest Service and APC partially oppose plaintiffs' first amended complaint, arguing that plaintiffs may not at this stage of the litigation add claims that could have been, but were not, raised initially. The defendants also oppose plaintiffs' second amended complaint, arguing that plaintiffs may not now add new plaintiffs to cure a defect in subject-matter jurisdiction. For the reasons set forth below, the court finds that plaintiffs' motion to amend complaint and motion for leave to file a second amended complaint are well founded.

### A. *Amending Pleadings under Fed.R. Civ.P. 15(a).*

Federal Rule of Civil Procedure 15(a) provides in relevant part that "[a] party may amend the party's pleading once as a matter of course at any time before a responsive pleading is served.... Otherwise a party may amend the party's pleading only by leave of court or by written consent of the adverse party...." Where court approval is required, "leave to amend lies 'within the sound discretion of the trial court.' ... In exercising its discretion 'a court must be guided by the underlying purpose of Rule 15—to facilitate decision on the merits rather than on the pleadings or technicalities.'" *DCD Programs, Ltd. v. Leighton,* 833 F.2d 183, 185–86 (9th Cir. 1987) (citations omitted). *See also Foman v. Davis,* 371 U.S. 178, 181–82, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962).

Rule 15(a) further provides that "leave shall be freely given when justice so requires," and the Supreme Court has admonished that "this mandate is to be heeded." *Foman,* 371 U.S. at 182, 83 S.Ct. at 230. This rule favoring amendments to pleadings should be applied with "extreme liberality." *DCD Programs,* 833 F.2d at

186 (citations omitted). "[L]iberality in granting leave to amend is not dependent on whether the amendment will add causes of action or parties." *Id.* In determining whether amendment is permissible, the relevant factors include "the presence or absence of undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party and futility of the proposed amendment." *Moore v. Kayport Package Express, Inc.,* 885 F.2d 531, 538 (9th Cir.1989).

### B. *New Claims.*

■ The Forest Service first contends that paragraphs 59 and 60 of plaintiffs' proposed first amended complaint "seek to raise NEPA issues which could have been, but were not raised in the original litigation." [3] Partial opposition (Docket No. 158) at 6. The Service notes that it already has undertaken and completed extensive supplementation of the 1981–86 EIS in response to plaintiffs' original claims, and argues that success on plaintiffs' newly raised claims will entail substantial duplication of effort and delay of operations. According to the Service, permitting plaintiffs to raise these preexisting claims by amendment at this stage of the litigation would constitute undue delay and would cause the agency undue prejudice. [4]

The court agrees that plaintiffs may not now raise challenges to the 1981–86 EIS and ROD that might have been raised in the original complaint; such would constitute undue delay to the prejudice of the Forest Service. *See Save Lake Washington v. Frank,* 641 F.2d 1330, 1339–40 (9th Cir.1981) (amendment to conform to issues actually tried under Fed.R.Civ.P. 15(b)). However, plaintiffs do not seek to raise such challenges here. After the Service agreed to prepare the SEIS, the Service dismissed plaintiffs' administrative appeal of the 1986–90 EIS and ROD as moot, stating that "the final SEIS should adequately address your concerns and respond to the merits of your appeal [of the 1986–90 EIS and ROD]." Plaintiffs' reply (Docket No. 167), ex. 2 at 2. Plaintiffs' proposed claims challenge the Final SEIS insofar as it pertains to 1986–90 EIS and ROD, and thus could not possibly have been raised in the original complaint. [5] Accordingly, plaintiffs' motion to amend complaint is deemed well taken.

### C. *New Plaintiffs.*

■ Defendants next contend that plaintiffs may not amend their complaint to add as plaintiffs various individuals and

---

**3.** APC opposes plaintiffs' proposed first amendment in its entirety for the same reasons adduced by the Forest Service. For the reasons set forth below, the court finds APC's opposition similarly unfounded.

**4.** The Forest Service also contends that Tenakee's proposed amendment challenging the range of alternatives considered in the SEIS is futile because it is the agency's prerogative to ignore alternatives that would not promote the purpose chosen by the agency for the project. The court finds insufficient basis to deny leave to amend on this ground. The merits of these claims are discussed more fully on consideration of plaintiffs' requests for interlocutory injunctive relief, in section VI, below.

**5.** Technically, Tenakee should have sought permission to join the proposed claims by motion to supplement rather than by motion to amend:

Although Rule 15(a) does not expressly state that an amendment must contain only matters that occurred within a particular time period, Rule 15(d) provides that any "transactions or occurrences or events which have happened since the date of the pleading" should be set forth in a supplemental pleading. Thus, impliedly, an amended pleading ... only should relate to matters that have taken place prior to the date of the earlier pleading.

6 C. Wright, A. Miller, M. Kane, *Federal Practice and Procedure* § 1473 n. 2–3 (2d ed. 1990); *see also United States ex rel. Atkins v. Reiten,* 313 F.2d 673, 674 (9th Cir.1963). However, this technical misnomer is immaterial, and does not prevent the court from considering the motion on its merits. 6 C. Wright, A. Miller, M. Kane, *supra* at § 1473 n. 2–3; *Reiten,* 313 F.2d at 674. Considerations such as delay and prejudice are relevant to either type of motion. Compare *Moore,* 885 F.2d at 538 (amending pleadings under Rule 15(a)), with *Keith v. Volpe,* 858 F.2d 467, 475 (9th Cir.1988) (supplementing pleadings under Rule 15(d)), *cert. denied sub nom., City of Hawthorne v. Wright,* — U.S. ——, 110 S.Ct. 61, 107 L.Ed.2d 28 (1989). The court in this case finds that the result is the same under either analysis.

organizations claiming subsistence interests affected by the Forest Service's action. Defendants argue that this court earlier ruled that all of the original plaintiffs in this action lacked standing to raise claims under section 810 of the Alaska National Interest Lands Conservation Act ("ANILCA"), 16 U.S.C. § 3120. Defendants object to plaintiffs' proposed amendment as an impermissible attempt to cure jurisdictional defects by the intervention of additional plaintiffs.

The court notes as an initial matter that plaintiffs here seek to add new plaintiffs not by intervention, but by joinder in an amended complaint. In this case, original plaintiffs, not nonparties, have moved for court permission to add the new plaintiffs. *Compare Spangler v. Pasadena City Bd. of Educ.*, 552 F.2d 1326, 1328 (9th Cir.1977) (intervention, not joinder, is the appropriate procedure for parties who seek on their own initiative to enter the lawsuit). The court further notes that pleadings may be amended to add new parties under Rule 15. *See DCD Programs, Ltd.*, 833 F.2d at 186; *Fifty Assocs. v. Prudential Ins. Co. of America*, 446 F.2d 1187, 1191 (9th Cir. 1970); *Pioche Mines Consolidated, Inc. v. Dolman*, 333 F.2d 257, 262 (9th Cir.1964), *cert. denied*, 380 U.S. 956, 85 S.Ct. 1081, 13 L.Ed.2d 972 (1965).

Notwithstanding defendants' mischaracterization of Tenakee's motion, however, defendants are correct that plaintiffs here are attempting to cure jurisdictional defects by adding new plaintiffs. Contrary to plaintiffs' assertion, this court earlier held that all, not merely one, of the original plaintiffs lacked standing to bring the ANILCA claims. On June 26, 1987, the court ordered, among other things, that plaintiffs' ANILCA claims be dismissed entirely for lack of standing. Memorandum and Order (Docket No. 75) at 2–3, 15 para. 5 (noting, among other things, that "plaintiffs *not now parties* to this suit could raise the § 810 issue at a later time") (emphasis added). Plaintiffs did not seek reconsideration of this holding.

Nevertheless, the court disagrees with defendants' contention that new plaintiffs may not be added to the litigation to cure defects in standing. Parties may seek to cure defects in subject-matter jurisdiction by amending the complaint. *See Warth v. Seldin*, 422 U.S. 490, 501, 95 S.Ct. 2197, 2206–07, 45 L.Ed.2d 343 (1975); *Fifty Assocs. v. Prudential Ins. Co. of America*, 446 F.2d 1187, 1192–93 (9th Cir.1970) (per curiam on rehearing); *Pioche Mines Consolidated*, 333 F.2d at 264. Plaintiffs specifically have been permitted to cure defects in standing by joining new plaintiffs in the litigation. *Mullaney v. Anderson*, 342 U.S. 415, 417, 72 S.Ct. 428, 430, 96 L.Ed. 458 (1952). Further, addition of new plaintiffs at this stage in the litigation is not *per se* objectionable. Rule 21 expressly permits a change in parties "at any stage of the action," Fed.R.Civ.P. 21; 7 C. Wright, A. Miller, M. Kane, *Federal Practice and Procedure* § 1688 n. 7 (2d ed. 1986 & Supp.1990), and the same basic standard for adding or dropping a party applies whether the pleader moves to amend a pleading under Rule 15(a) or to add a party under Rule 21. 6 C. Wright, A. Miller, M. Kane, *supra*, § 1474 at 554. Indeed, joinder of new plaintiffs to cure defects in standing has been permitted as late in the litigation as during Supreme Court review. *Mullaney*, 342 U.S. at 417, 72 S.Ct. at 430.

Defendants do not argue that the right to relief asserted by the new plaintiffs does not pertain to the subject matter of this litigation, nor do defendants deny the existence of common questions of law and fact underlying the claims of both the existing and prospective plaintiffs. Accordingly, the court finds plaintiffs' motion for leave to file a second amended complaint well taken.

## IV. FOREST SERVICE'S MOTION FOR PARTIAL DISMISSAL.

In 1979, the Forest Service adopted the Tongass Land Management Plan ("TLMP"), a programmatic EIS to which are tiered site-specific EIS's prepared for each five-year operating period, and the Final Environmental Impact Statement ("FEIS") on which the TLMP is based. In the winter of 1985–86, the Forest Service

amended the TLMP, adopting among other things the Aquatic Habitat Management Unit ("AHMU") Handbook. Ex. MD–1, Forest Service's motion (Docket No. 171). The Handbook adopts a variable, site-specific methodology for managing riparian zones within harvest areas according to prescribed standards. Ex. MD–2 (Docket No. 171).

In 1988, the National Marine Fisheries Service ("NMFS") adopted a policy recommending retention of uniform, 100–foot, uncut buffer strips along certain streams. The Forest Service considered the NMFS policy but rejected it in the SEIS underlying plaintiffs' amended complaint. Plaintiffs' buffer-strip claims assert that the Service's decision not to adopt the NMFS 100–foot stream buffer policy violates NEPA.

The Forest Service contends that this court's jurisdiction to consider plaintiffs' buffer-strip claims has been withdrawn by section 312 of the Interior Appropriations Act of 1989. Plaintiffs dispute this contention on two grounds: (1) that the buffer strip claims challenge particular activities under the TLMP rather than the TLMP itself; and (2) that the TLMP is not an "existing plan" within the meaning of section 312. For the reasons set forth below, the court finds that section 312 does not bar plaintiffs' buffer-strip claims.

A. *Section 312 of the Interior Appropriations Act of 1989.*

Section 312 provides in relevant part: [6]

The Forest Service ... [is] to continue to complete as expeditiously as possible development of ... Forest Land and Resource Management Plans to meet all applicable statutory requirements. Notwithstanding the date in section 6(c) of the NFMA (16 USC 1600), the Forest Service ... may continue the management of existing lands within [its] jurisdiction under existing land and resource management plans pending the completion of new plans. Nothing shall limit

judicial review of particular activities on these lands. *Provided however,* that there shall be no challenges to any existing plan on the sole basis that the plan in its entirety is outdated ...: *Provided further,* that any and all particular activities to be carried out under existing plans may nevertheless be challenged.

Pub.L. No. 101–121, § 312, 103 Stat. 701, 743 (1989) (effective October 23, 1989) (original emphasis) (reenacting without modification Pub.L. No. 100–446, § 314, 102 Stat. 1774, 1825 (1988), reenacting without modification Pub.L. No. 100–202, § 314, 101 Stat. 1329, 1329–254 (1987), amending Pub.L. No. 99–500, § 101(h), 100 Stat. 1783, 1783–268 (1986), and Pub.L. No. 99–591, § 101(h), 100 Stat. 3341, 3341–268 (1986)).

The court notes at the outset that the statute's jurisdictional provisions employ "extraordinary language" that is "anything but clear." *Portland Audubon Soc'y v. Hodel,* 866 F.2d 302, 304 (9th Cir.), *cert. denied sub nom., Northwest Forest Resource Council v. Portland Audubon Soc'y,* —— U.S. ——, 109 S.Ct. 3229, 106 L.Ed.2d 577 (1989). However, it is evident that section 312 by its terms only bars claims that challenge "existing plan[s]" on grounds that the agency has failed to revise or supplement the plan in light of new information. *See Oregon Natural Resources Council v. Mohla,* 895 F.2d 627, 629–30 (9th Cir.) (discussing section 314 of the Interior Appropriations Act of 1988, predecessor to section 312 and identical thereto), *cert. denied,* —— U.S. ——, 110 S.Ct. 2621, 110 L.Ed.2d 642 (1990). While section 312 bars challenges to a Forest Service plan "on the sole basis that the plan in its entirety is outdated," it permits challenges to "any and all particular activities to be carried out under existing plans." *Id.* at 629. However, a claim couched in site-specific terms and directed toward only a limited portion of the plan will nevertheless be deemed a challenge to "the plan in its entirety" where the challenge, if successful, would enable the plaintiff subse-

---

**6.** Section 312's parallel provisions regarding Bureau of Land Management ("BLM") forest plans are omitted.

quently to challenge the entire plan, area by area, on the same grounds. *Id.* at 630. Further, a claim will be deemed a challenge to the plan rather than to particular activities thereunder where the claim challenges a land use decision made in the plan, regardless whether the claim is framed in site-specific terms. *Id.* at 629–30; *see also Portland Audubon Soc'y v. Lujan,* 884 F.2d 1233, 1239–40 (9th Cir.) (discussing bar of claims challenging BLM plans under parallel provisions of predecessor statute), *cert. denied sub nom., Northwest Forest Resource Council v. Portland Audubon Soc'y,* — U.S. ——, 109 S.Ct. 3229, 106 L.Ed.2d 577 (1989).

**B.** *The "Plan/Activities" Distinction.*

The court agrees with the Forest Service's contention that plaintiffs' buffer-strip claims challenge the TLMP rather than particular activities thereunder. These claims challenge the Forest Service's decision not to adopt the NMFS recommendation, a decision that was made by the agency in the amended TLMP. Plaintiffs' counterargument—that their challenge, if successful, would affect only a limited set of activities within a relatively small portion of the geographical area covered by the plan—is unavailing. It is the underlying nature of plaintiffs' claims, not the scope of relief requested, which determines whether or not the claims challenge particular activities or the TLMP. *Lujan,* 884 F.2d at 1239; *Mohla,* 895 F.2d at 629–30.

**C.** *Is the TLMP an "Existing Plan"?*

Ultimately, however, the court agrees with plaintiffs that section 312 does not bar the buffer strip claims because the TLMP

is not an "existing plan" within the meaning of the statute. Section 6 of the National Forest Management Act of 1976 ("NFMA"), 16 U.S.C. § 1604, prescribes standards for national forest management plans and directs the Secretary of Agriculture to prepare such plans, reaffirming the continuing validity of "existing" plans during the revision process.[7] The Forest Service does not dispute plaintiffs' assertion based on the language and history of section 312 that Congress enacted the jurisdictional bar to facilitate replacement of pre-NFMA national forest management plans by insulating "existing" plans from certain challenges pending revision. *See* H.R. Conf.Rep. No. 99–1002, 99th Cong., 2d Sess. 52 (1986). Presumably, then, the "existing" plans Congress intended to preserve through section 6 are plans adopted under authority pre-dating the NFMA. There is no evidence that Congress in enacting section 312 intended also to bar challenges to new forest management plans adopted under the authority of section 6 of the NFMA.

The Forest Service does not contest that a national forest management plan promulgated under section 6 of the NFMA is not an "existing plan" for purposes of section 312. Instead, the Service notes that section 6 of the NFMA also directed the Secretary to promulgate regulations prescribing the procedures for developing NFMA plans.[8] The Service asserts that the TLMP is not a true NFMA plan because it was adopted several months before the Service promulgated final NFMA regulations. According to the Forest Service, plans adopted before promulgation of NFMA

**7.** Section 6(c) of the NFMA provides in relevant part:

The Secretary shall begin to incorporate the standards and guidelines required by this section in plans for units of the National Forest System as soon as practicable after October 22, 1976 and shall attempt to complete such incorporation for all such units by no later than September 30, 1985.... Until such time as a unit of the National Forest System is managed under plans developed in accordance with this subchapter, the management of such unit may continue under *existing* land and resource management plans.

16 U.S.C.A. § 1604(c) (1985 & Supp.1990) (emphasis added).

**8.** Section 6(g) of the NFMA provides in relevant part:

As soon as practicable, but not later than two years after October 22, 1976, the Secretary shall ... promulgate regulations ... that set out the process for the development and revision of the land management plans, and the guidelines and standards prescribed by this subsection.

16 U.S.C.A. § 1604(g) (1985 & Supp.1990).

regulations are not NFMA plans, but rather "existing" plans within the meaning of section 312. In support of its view, the Service notes that the agency's NFMA regulations distinguish "existing" plans from plans developed under the regulations, as distinguished from those adopted after enactment of the NFMA.[9]

The court finds the Service's argument without merit. The Service consistently has characterized the TLMP as a NFMA plan. *See* TLMP at iii, ex. 1, plaintiffs' surreply (Docket No. 203); statements of Forest Service officials cited in plaintiffs' surreply at 2–3. In fact, the TLMP expressly acknowledges the Service's draft NFMA regulations, which were published several months before the TLMP was promulgated. *See* 43 Fed.Reg. 39046 (Aug. 31, 1978); TLMP FEIS App. E at 1, ex. 1 (Docket No. 203). Further, nothing in the NFMA's language or structure suggests that Congress intended promulgation of regulations under section 6(g) to be a prerequisite to promulgation of plans under section 6(c). As plaintiffs note, the legislative history and the exhortation in both sections to complete each process "as soon as practicable" suggests otherwise. *See* S.Conf.Rep. No. 1335, 94th Cong., 2d Sess. 22, 23 (1976), *reprinted in* 1976 U.S. Code Cong. & Admin.News 6724, 6725. The Forest Service' purported contrary interpretation in the agency's own regulations is unpersuasive here because the Service could not by regulation impose requirements on the planning process that were not authorized by Congress.

The court holds that section 312 does not bar plaintiffs' buffer-strip claims because the TLMP is not an "existing plan" within the meaning of the statute. Accordingly, the court declines to reach the question whether other prerequisites for application of the statute are satisfied here, such as whether plaintiffs' buffer strip claims challenge the TLMP as "outdated."

---

**9.** Forest Service regulations provide in relevant part:

> Until a forest planning area of the National Forest System is managed under a forest plan developed pursuant to this subpart and ap-

## V. FOREST SERVICE'S MOTION TO STRIKE EXHIBITS.

The Forest Service contends that 30 of 46 documentary exhibits submitted in support of plaintiffs' motion and supplemental motion for preliminary injunction should be stricken for the following reasons: (1) because these exhibits comprise materials not contained in the administrative record for the SEIS presently before the court; or (2) because the exhibits comprise evidence that is incompetent, irrelevant, or inadmissible hearsay. Plaintiffs do not oppose entry of an order striking exhibits 11, 12, and 21, but otherwise oppose the Service's motion. For the reasons set forth below, the court finds that entry of an order striking the remainder of plaintiffs' exhibits is unwarranted.

### A. Extra–Record Evidence.

The Forest Service first contends that plaintiffs' motions for interlocutory injunctive relief do not fall within any exception to the general rule in administrative challenges prohibiting consideration of materials not included in the administrative record. According to the Service, the court may consider plaintiffs' exhibits in balancing the equities of injunctive relief, but may not consider them on the merits of plaintiffs' claims.

Generally, the trial court is limited to the existing administrative record when reviewing actions taken by agencies pursuant to the informal rule-making procedures of section 553 of the Administrative Procedure Act ("APA"), 5 U.S.C. § 553. *Kunaknana v. Clark*, 742 F.2d 1145, 1152 (9th Cir.1984). However, extra-record evidence may be admitted to challenge the scientific validity of an agency's decision where, as here, it suggests that the agency failed to consider all the relevant factors. *Kunaknana*, 742 F.2d at 1152. The court agrees with plaintiffs that the extra-record exhibits may be considered here because the exhibits support plaintiffs' claims that the

> proved by the Regional Forester, the land may continue to be managed under existing land use and resource plans.
>
> 36 C.F.R. § 219.29(a) (1989).

Forest Service failed to consider factors relevant to its decision.

### B. *Competency.*

■■■ The Forest Service next objects that many of plaintiffs' documentary exhibits are unauthenticated and constitute incompetent opinion evidence and inadmissible hearsay.

The primary purpose of interlocutory injunctive relief "is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Texas v. Camenisch,* 451 U.S. 390, 395, 101 S.Ct. 1830, 1834, 68 L.Ed.2d 175 (1981). "Given this limited purpose, and given the haste that is often necessary if those positions are to be preserved, a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Id.* (citations omitted). "The trial court may give even inadmissible evidence some weight, when to do so serves the purpose of preventing irreparable harm before trial." *Flynt Distributing Co., Inc. v. Harvey,* 734 F.2d 1389, 1394 (9th Cir.1984) (citations omitted).

The court rejects as unsupported the Service's argument that the evidentiary standards pertinent to summary judgment proceedings should be applied on motions for preliminary injunction in administrative review cases. Preliminary injunction and summary judgment have different purposes and, accordingly, different requirements. "A party ... is not required to prove his case in full at a preliminary-injunction hearing, and the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits." *Camenisch,* 451 U.S. at 395, 101 S.Ct. at 1834. Conversely:

The purpose of the summary judgment procedure is to dispose of a case without a trial when there is no genuine issue of material fact and one party is entitled to a judgment as a matter of law. Since summary judgment is a substitute for a trial on the merits, it is vital that the party opposing the motion be accorded the same evidentiary safeguards that would be applicable at trial in determining whether there is a triable issue of fact.... These considerations do not apply in the Rule 65 context....

11 C. Wright, A. Miller, F. Elliot, *Federal Practice and Procedure* § 2949 n. 6 (1973 & Supp.1990) (footnotes omitted).

The court notes that the Service does not affirmatively dispute the authenticity of the exhibits, but rather objects that plaintiffs have failed to satisfy foundational requirements under the Federal Rules of Evidence. The court holds that failure to lay foundation does not in itself provide grounds for striking exhibits from the record before the court on motions for preliminary injunction.[10] Further, the court finds that the Forest Service's opinion and hearsay objections do not provide grounds for striking the exhibits. Courts considering evidence of questionable competence will take this factor into account to the extent it casts doubt on the credibility of the evidence. *See* 11 C. Wright, A. Miller, F. Elliot, *supra,* at § 2949 n. 11.

### C. *Relevancy.*

■■■ Finally, the Forest Service contends that many of plaintiffs' documentary exhibits are irrelevant. In support of its relevancy objections, however, the Service merely reiterates the very agency position that underlies many of plaintiffs' claims—that the allegations contained in the exhibits are irrelevant to the agency's analysis in the SEIS, either because the allegations are

---

**10.** The Forest Service cites the decision of this court in *Sierra Club v. Penfold,* Memorandum and Order, No. A86–083 Civ. (D.Alas., Oct. 15, 1986), *reconsideration granted in part,* Memorandum and Order (Jan. 29, 1987), for the proposition that plaintiffs have the burden to show foundational elements necessary for admission on a motion for preliminary injunction. The Service is mistaken in this regard. As this court

explained in the cited memorandum, the question of admissibility in *Penfold* arose in the context of summary judgment, not preliminary injunction: "Federal defendants have challenged a number of the exhibits that accompanied plaintiffs' motion for preliminary injunction and are *now relied upon in plaintiffs' motion for partial summary judgment....*" *Id.* at 2 (emphasis added).

untrue or insignificant. At issue here is not whether the exhibits are relevant to agency decision makers, but rather whether they are relevant to plaintiffs' claims. The court finds that they are. The Forest Service's challenges to the substance of plaintiffs' evidence will be considered in section VI, below, to the extent they are relevant to the merits of plaintiffs' motions for preliminary injunction.

## VI. PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION.

Plaintiffs seek entry of an order (1) prohibiting the Forest Service from approving logging or roadbuilding in certain value control units ("VCUs"); [11] (2) prohibiting the Forest Service from approving logging and roadbuilding (except right angle stream crossings) within 100 feet of all Class I and II fish streams and Class III streams which significantly influence Class I and II streams (as explained in the NMFS policy); and (3) requiring the Forest Service to implement a comprehensive monitoring program to measure compliance with state water quality standards and impacts to fish and fish habitats, until full compliance with NEPA, ANILCA, and the Clean Water Act ("CWA"), 33 U.S.C. § 1313, are demonstrated. Plaintiffs further request that the court enjoin all logging and roadbuilding activities approved by the ROD in certain harvest units,[12] and in certain areas identified as old-growth prescription areas in the 1986 FEIS.[13]

### A. *Judicial Review of an Environmental Impact Statement.*

 Plaintiffs contend that the FSEIS violates NEPA, ANILCA, the CWA, and NFMA. "[T]he burden of proof is on the plaintiffs to establish that [an] EIS is inadequate...." *Stop H–3 Ass'n v. Lewis*, 538 F.Supp. 149, 159–60 (D.Haw.1982) (citations omitted), *aff'd in part, rev'd in part on other grounds*, 740 F.2d 1442 (9th Cir.

1984), *cert. denied*, 471 U.S. 1108, 105 S.Ct. 2344, 85 L.Ed.2d 859 (1985). District court review of the adequacy of an EIS is governed principally by the APA, which provides that agency actions, findings, and conclusions may be set aside if "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), or if undertaken "without observance of procedure required by law," 5 U.S.C. § 706(2)(D). *City of Angoon v. Hodel*, 803 F.2d 1016, 1020 (9th Cir.1986), *cert. denied*, 484 U.S. 870, 108 S.Ct. 197, 98 L.Ed.2d 148 (1987); *Oregon Environmental Council v. Kunzman*, 817 F.2d 484, 492 (9th Cir.1987). In *Motor Vehicle Manufacturers Ass'n of U.S., Inc. v. State Farm Mutual Automobile Insurance Co.*, the United States Supreme Court construed the standard of review prescribed by the APA for courts reviewing actions taken by agencies pursuant to the informal rulemaking procedures of section 553 of the Administrative Procedure Act, 5 U.S.C. § 553:

> The scope of review under the "arbitrary and capricious" standard is narrow and a court is not to substitute its judgment for that of the agency. Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a "rational connection between the facts found and the choice made." In reviewing that explanation, we must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a differ-

---

**11.** VCU 204 (Upper Game Creek), VCU 238, VCU 399 (units 8, 9, and 12), VCU 400 (unit 7), and VCU 421 (units 6, 7, 9, and 11).

**12.** Units 3, 6, 8, and 10–14 of VCU 420 in AA12.

**13.** VCU 201 (unit 28), VCU 202 (units 15, 16, 32, 37, and 38), VCU 210 (units 12 and 13), VCU 212

(units 4, 12, 13, 14, 23, and 33), VCU 213 (units 3, 4, 6, and 7), VCU 214 (unit 10), VCU 215 (units 60 and 67), VCU 217 (unit 42), VCU 219 (units 2 and 3), VCU 238 (units 7, 18, 19, 20, 24, and 25), VCU 400 (unit 7), VCU 402 (unit 9), VCU 419 (units 13, 244, and 245), VCU 420 (unit 7), and VCU 421 (unit 6).

ence in view or the product of agency expertise. The reviewing court should not attempt itself to make up for such deficiencies: "We may not supply a reasoned basis for the agency's action that the agency itself has not given." We will, however, "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."

463 U.S. 29, 43, 103 S.Ct. 2856, 2866–67, 77 L.Ed.2d 443 (1983) (citations omitted).

"The Council on Environmental Quality's ('CEQ') regulations govern the form, content, and preparation of an EIS." *Oregon Environmental Council,* 817 F.2d at 492 (citing 40 C.F.R. §§ 1500–1508 (1986)). In this circuit, courts employ a "rule of reason" which requires that an EIS contain a reasonably thorough discussion of the significant aspects of the probable environmental consequences of the action. *Id.* (citations omitted). The district court must make "a pragmatic judgment whether the EIS's form, content and preparation foster both informed decisionmaking and informed public participation." *Id.* (citations omitted). The reviewing court may not "fly speck" an EIS and hold it insufficient on the basis of inconsequential, technical deficiencies. *Id.* (citations omitted). Under 5 U.S.C. § 706(2), the reviewing court must take "due account ... of the rule of prejudicial error." *Rybacheck v. EPA,* 904 F.2d 1276, 1284 (9th Cir.1990) (judicial review of EPA regulations). However, an EIS may be found inadequate under NEPA if it does not reasonably set forth sufficient information to enable the decision maker to consider the environmental factors and make a reasoned decision. *Oregon Environmental Council,* 817 F.2d at 493 (citations omitted).

### B. *Preliminary Injunction Standard.*

■■■ On a motion for interlocutory injunctive relief, "there are essentially two factors to be considered: The likelihood of the plaintiff's success on the merits; and, the relative balance of potential hardships to the plaintiff, defendant, and public." *State of Alaska ex rel. Yukon Flats School Dist. v. Native Village of Venetie,* 856 F.2d 1384, 1388–89 (9th Cir.1988) (citations omitted). To obtain a preliminary injunction, the moving party must show: either (1) a combination of probable success on the merits and the possibility of irreparable injury, or (2) that serious questions are raised and the balance of hardships tips sharply in its favor. These formulations are not different tests but represent two points on a sliding scale in which the degree of irreparable harm increases as the probability of success on the merits decreases. Under either formulation, the moving party must demonstrate a significant threat of irreparable injury, irrespective of the magnitude of the injury.

*Big Country Foods, Inc. v. Bd. of Educ. of Anchorage School District,* 868 F.2d 1085, 1088 (9th Cir.1989) (citations omitted). Where the plaintiff complains that the defendant has violated a federal statute, the court must determine whether Congress in enacting that statute has foreclosed the exercise of the court's traditional discretion to balance the interests of the parties and the public when considering whether to grant injunctive relief. *Amoco Production Co. v. Village of Gambell,* 480 U.S. 531, 540–42, 107 S.Ct. 1396, 1402–03, 94 L.Ed.2d 542 (1987); *Weinberger v. Romero–Barcelo,* 456 U.S. 305, 313, 102 S.Ct. 1798, 1803–04, 72 L.Ed.2d 91 (1982); *Stein v. Barton,* 740 F.Supp. 743, 756 (D.Alas. 1990). Congress did not foreclose the court's equitable discretion when it enacted NEPA, *Save the Yaak Committee v. Block,* 840 F.2d 714, 722 (9th Cir.1988); *Stein,* at ——, nor did it do so when it enacted ANILCA. *Amoco Production Co.,* 107 S.Ct. at 1403; *Hanlon v. Barton,* No. J88–025 Civ., Memorandum and Order at 31 (D.Alas. November 14, 1988).

### C. *Changes in the Project Scope.*

■■■ Plaintiffs first contend that the Service in the FSEIS altered the project's scope without public notice and participation, in violation of NEPA and CEQ regulations. According to plaintiffs, all of the environmental planning and decision documents for the 1986–90 period that were issued prior to the FSEIS evince a common scope and purpose for the project:

to satisfy contractual timber commitments through the end of the planning period, December 31, 1990. *E.g.* Draft SEIS, Phase I, ch. 1–3. The FSEIS, however, analyzes options for satisfying contractual obligations "until *at least* December 31, 1990," FSEIS ch. 1–5 (emphasis added), and the ROD allocates sufficient timber to provide for harvesting through a "transition" period running from the end of the 1986–90 period until completion of the next planning cycle. ROD at 12. The ROD explains that this transition is necessary to permit continued harvesting while the Service converts from a five-year planning process to an annual, individual-area planning process under a 1989 amendment to the APC Contract. *Id.*

At the outset, the court questions whether the Service made any change in the scope of the project described in the DSEIS. The DSEIS expressly indicates that sufficient harvesting will be authorized "to satisfy contractual obligations with APC until December 31, 1990, *and to assure a smooth transition* to future harvest activities." AA 3 DSEIS, ch. 1–14 (emphasis added). Plaintiffs protest that this notice is "buried in half of a sentence in a document consisting of several thick volumes." Plaintiffs' consolidated reply filed March 5, 1990 (Docket No. 168) at 1–2 n. 2. However, all the planning documents for the 1986–90 operating period clearly indicate that timber units authorized for harvest but not harvested during that period "carryover" to the next period, as provided in section 7(a) of the APC Contract. This practice has long been a conspicuous and extensively litigated feature of Forest Service timber management in the sale area. The only change in the FSEIS appears to be the Service's *enunciation* of the project's scope, which now directly reflects this longstanding practice.

Assuming, without holding, that the Service did change the scope of the project in the FSEIS, there nevertheless would appear to be little likelihood of plaintiffs' success on this challenge. CEQ regulations, which are entitled to substantial deference, require a federal agency to supplement an EIS if "the agency makes substantial changes in the proposed action *that are*

*relevant to environmental concerns." Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 109 S.Ct. 1851, 1858 & n. 16, 104 L.Ed.2d 377 (1989) (discussing 40 C.F.R. § 1502.9(c)(1)(i)) (emphasis added). Plaintiffs object that the FSEIS "now *plans* a carryover in excess of 300 MMBF, about the volume harvested over the last four years," in order to accommodate harvesting during the transition period. Plaintiffs' consolidated reply at 2 n. 3 (original emphasis). Plaintiffs further object that the Service declined to consider project alternatives that would not provide access to the full amount of carryover before the end of 1990. *Id.* at 3. However, plaintiffs do not suggest that these allegedly offensive aspects of the FSEIS are significantly different from the carryover provisions and the range of alternatives considered in the pre-FSEIS documents. Consequently, neither these objections nor plaintiffs' purely semantical objection to the change in language in the FSEIS evidence any environmentally relevant change made in the FSEIS.

### D. *Range of Alternatives.*

Plaintiffs aver that the Forest Service violated NEPA and ANILCA by neglecting or specifically declining to consider in the FSEIS numerous alternative courses of action that plaintiffs contend would cause fewer adverse environmental and subsistence impacts. The court will consider these arguments seriatim.

#### 1. ALTERNATIVES REQUIRING MODIFICATION OR BREACH OF THE CONTRACT.

Plaintiffs first propose that the Service is obligated under NEPA to consider alternatives, such as providing timber for harvest from outside the sale area, which require amendment, cancellation, or breach of the APC Long–Term Contract, or revision of the TLMP. The Forest Service argues that these alternatives are inconsistent with the purpose of the project designated by the agency—"to provide the volume of timber needed to satisfy contractual obligations with APC until at least December 31,

1990," FSEIS ch. 1–5—and therefore need not be considered.

An EIS must include a "detailed statement" discussing "alternatives to the proposed action." *City of Angoon*, 803 F.2d at 1020 (quoting NEPA, 42 U.S.C. § 4332(2)(C)(iii)). Plaintiffs challenging an agency's failure to consider a proposed alternative have the burden of proving specific facts showing that the alternative was reasonably ascertainable and practicable at the time the EIS was prepared. *Id.* at 1021–22. The reviewing court employs a "rule of reason" in judging whether the agency described those alternatives necessary to permit a "reasoned choice," and whether the EIS's "selection and discussion of alternatives fosters informed decision-making and informed public participation." *Id.* at 1020 (citations omitted).

Except for consideration of the "no-action" alternative, discussed in section VI–E, below, NEPA does not require a federal agency to consider alternatives which do not achieve the purpose contemplated for the proposed action. *Id.* at 1021; *Stein*, Memorandum Opinion at 7–8. Accordingly, where, as here, the project's stated purpose is to satisfy a long-term timber contract, NEPA does not obligate the Service to consider amending, canceling, or breaching that contract.

Further, NEPA does not circumscribe the agency's discretion to formulate project goals. *Angoon*, 803 F.2d at 1021. "[T]he strong precatory language of § 101 of the Act and the requirement that agencies prepare detailed impact statements inevitably bring pressure to bear on agencies 'to respond to the needs of environmental quality.'" *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 109 S.Ct. 1835, 1845, 104 L.Ed.2d 351 (1989) (quoting remarks of Sen. Muskie, 115 Cong.Rec. 40425 (1969)). However, while these procedures:

> are almost certain to affect the agency's substantive decision, it is now well settled that NEPA itself does not mandate particular results, but simply prescribes the necessary process. If the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values

outweigh the environmental costs.... Other statutes may impose substantive environmental obligations on federal agencies, but NEPA merely prohibits uninformed—rather than unwise—agency action.

*Id.* 109 S.Ct. at 1846 (citations and footnote omitted). Accordingly, NEPA does not require the Service to consider modifying the programmatic resource management goals set for the Tongass in the TLMP.

## 2. ALTERNATIVES REQUIRING REINTERPRETATION OF THE CONTRACT.

Plaintiffs next propose that the Service misinterpreted the Contract and therefore failed to consider preferable alternatives that are consistent with the project's purpose. Specifically, plaintiffs contend that the Service erroneously declined to consider certain alternatives because they would not permit APC to harvest before the end of 1990 the full amount of timber it would need to sustain operations through the post–1990 transition period. Plaintiffs aver that APC could not possibly harvest the entire amount by the end of this year, and plaintiffs point to the Service's comment that, "While APC is not required to harvest these units before December 31, 1990, there must be reasonable assurance the units are available for harvest by this date." FSEIS ch. 2–35. As the Service admits, logistical constraints associated with preparing units for harvest in an accelerated fashion render impracticable all but the most geographically concentrated harvest alternatives. *See* FSEIS ch. 2–36. This, according to plaintiffs, is environmentally undesirable and unnecessary under the Contract. According to plaintiffs, the Service should have considered an alternative that would provide APC with no more than it could practicably harvest during each year of the transition period. Plaintiffs further contend that the Service's erroneous interpretation of the Contract caused it to exclude from consideration all alternatives which would not provide APC with 550 million board-feet ("mmbf") of timber during the last three years of this operating period.

The Forest Service counters that the agency's interpretation of the Contract is conclusive because it is an interpretation agreed upon by both parties to the contract—the Forest Service and APC. The court rejects this notion. The Service's interpretation of the Contract lies at the heart of its definition of the purpose of the project and, consequently, constitutes a "conclusion" reviewable under the APA. 5 U.S.C. § 706(2)(A).

Nevertheless, at this juncture there appears to be little likelihood of plaintiffs' success on the merits of these claims. Plaintiffs' have not carried their burden of showing that their construction of the Contract is more reasonable than the defendants.

### 3. OTHER REASONABLE ALTERNATIVES.

Plaintiffs argue that the Service failed to consider several reasonable alternatives. Plaintiffs object to the Service's failure to evaluate a project alternative incorporating the NMFS uniform buffer-strip standard instead of the variable, site-specific AHMU standard for riparian management. Plaintiffs also object to the Service's failure to consider alternative logging boundaries within each harvest unit.

As regards evaluation of an alternative incorporating the NMFS standard, the Forest Service responds that it reasonably declined to evaluate such an alternative after concluding that adoption of the NMFS standard "could result in lower timber volumes and would not necessarily provide a higher level of protection for the fisheries resource than that provided by the AHMU policy." AA–2 FSEIS ch. 4–26. With respect to consideration of alternative logging boundaries, the Service notes that it did evaluate alternative harvest unit configurations within VCUs, but contends that presentation of alternative logging boundaries would require a level of preparation and detail that the agency does not and need not possess at this stage in the planning process.

In order to succeed on their buffer-strip claim, plaintiffs must show that the Service's assessments of the NMFS standard is "arbitrary and capricious." It does not appear likely on the record presently before the court that plaintiffs will succeed in carrying this burden. Further, for the reasons set forth in section VI–I, below, it does not appear that the Forest Service's decision to defer delineating logging boundaries until later in the planning process prevents the agency from making a "reasoned choice" among alternatives. Accordingly, success on the merits of plaintiffs' logging-boundary claims also appears unlikely.

### 4. ALTERNATIVES REQUIRED UNDER ANILCA.

Plaintiffs contend that by rejecting various alternatives without first determining whether they would ameliorate impacts on subsistence interests, and by declining to cancel or amend the Contract, allocate less timber for harvest each year, or provide timber from outside the sale area, the Forest Service failed to consider "the availability of other lands" as required under ANILCA. The Forest Service argues that ANILCA, like NEPA, does not require affected agencies to consider project alternatives which do not achieve the purpose contemplated for the proposed action.

The Forest Service's argument is correct so far as it goes and, accordingly, it does not appear likely that plaintiffs will succeed on the merits of these claims. However, as discussed in section VI–L–1, below, ANILCA, unlike NEPA, does impose substantive limitations on an affected agency's discretion to choose an alternative from among those evaluated in an EIS. Consequently, an agency proceeds at its peril where it fails to include within the set of alternatives to be considered one which can be implemented in conformity with ANILCA's substantive mandate.

### E. *No–Action Alternative.*

Plaintiffs contend that the no-action alternative considered by the Forest Service in the FSEIS is improper because it contemplates cessation of logging in individual portions of the contract area but not in all portions of the contract area throughout the operating period. Plaintiffs also object that the Service failed to evaluate the eco-

nomic consequences of breaching the Contract by suspending harvesting.

An EIS must evaluate and discuss a "no action" alternative. 40 C.F.R. §§ 1052.-14(d), 1508.25(b)(1). For purposes of a site-specific timber harvest EIS such as this one, "no action" means "suspension of harvest activity." *See Hanlon,* 740 F.Supp. at 1457. Where, as here, the project's purpose is to provide for harvesting within a sale area, "no action" means suspension of harvesting within the entire sale area, not merely within portions thereof. The court notes that defendants do not dispute that the agency has the same obligation to evaluate the consequences of "no action" as it does of other alternatives. Accordingly, the court finds that the probability of success on the merits of plaintiffs' no-action claim may be high.

### F. *Site–Specific Impact Evaluation.*

Plaintiffs argue that the FSEIS and DSEIS are deficient because they discuss site-specific impacts of proposed harvesting on subsistence resources but do not correlate those impacts with the specific subsistence needs of each affected community. The Forest Service contends that it was not obligated under section 810(b) of ANILCA to incorporate in the EIS any discussion of the evaluations of subsistence impacts, availability of other lands, and less restrictive alternatives required under section 810(a), but rather only to include in the EIS the determinations prescribed by ANILCA § 810(a)(3).[14]

ANILCA § 810(b) provides that "[i]f the Secretary is required to prepare an environmental impact statement pursuant to section 4332(2)(C) of Title 42, he shall provide the notice and hearing and include the *findings* required by subsection (a) of this section as part of such environmental impact statement." 16 U.S.C. § 3120(b) (emphasis added). As noted above, section 810(a) re-

quires the agency to make both "evaluat[ions]" and "determin[ations]" in specified circumstances. The court finds no merit in the Service's argument that section 810(b) by the ordinary meaning of its terms requires the agency to include within the EIS the determinations but not the evaluations required by section 810(a); the court holds that both must be incorporated in the EIS when section 810(b) applies.

Nevertheless, the court finds that plaintiffs have shown little likelihood of success on the merit of these claims:

A site-specific EIS must contain a reasonably thorough discussion of the distinguishing characteristics and unique attributes of each area affected by the proposed action. *California v. Block,* 690 F.2d 753, 761–64 (9th Cir.1982). Proposed activities must be sufficiently correlated with environmental factors in each affected area to facilitate public discussion of the project; this may be accomplished by supplementing generic discussions of environmental values with text or maps showing how relevant considerations were or were not factored into planning decisions. *City of Tenakee Springs v. Courtright,* No. J86–024 Civ., slip op. at 10 [1987 WL 90272] (D.Alas. June 26, 1987) (*Tenakee II*).

*Stein,* Memorandum Opinion at 8–9. As plaintiffs acknowledge, the EIS's identify site-specific impacts on subsistence resources, incorporate maps identifying which sites are important for subsistence use generally, and catalog how and to what extent each community utilizes subsistence resources, including data on per capita consumption. In light of the additional information regarding subsistence use provided to affected communities by the Service prior to each ANILCA hearing, *see* discussion in section VI–K–3, below, it does not appear likely that plaintiffs will succeed in

---

**14.** ANILCA § 810(a)(3) prohibits federal land managers from effecting any "use, occupancy or disposition" of public lands in Alaska "which would significantly restrict subsistence uses" until the official has determined that:

(A) such a significant restriction of subsistence uses is necessary, consistent with sound management principles for the utilization of the public lands,

(B) the proposed activity will involve the minimal amount of public lands necessary to accomplish the purposes of such use, occupancy, or other disposition, and

(C) reasonable steps will be taken to minimize adverse impacts upon subsistence uses and resources resulting from such actions.

16 U.S.C. § 3120(a)(3).

showing that the EIS also must specifically show which subsistence areas are important for each given subsistence community in order to satisfy NEPA and ANILCA.

### G. *Cumulative Environmental Impacts.*

Plaintiffs next contend that the Forest Service failed adequately to evaluate cumulative environmental and subsistence impacts in the FSEIS. Plaintiffs challenge the Service's methodology of evaluating cumulative impacts one "analysis area" ("AA") at a time, rather than in one consolidated analysis. Plaintiffs also challenge the FSEIS because it does not discuss cumulative impacts in areas outside of the sale area. The Forest Service argues, among other things, that there is no indication in the record that there will be any reasonably foreseeable significant impacts beyond those addressed in the FSEIS.

As this court stated in *Hanlon:*

NEPA and its implementing regulations require federal agencies to include an evaluation of a proposed action's cumulative impacts in the EIS prepared for that action. *Save the Yaak Committee v. Block,* 840 F.2d 714, 721 (9th Cir.1988); *Fritiofson v. Alexander,* 772 F.2d 1225, 1243 (5th Cir.1987); 40 C.F.R. §§ 1508.7, 1508.25(c)(3). Cumulative impact "is the impact on the environment that results from the incremental impact of the action when added to other past, present, *and reasonably foreseeable future actions* regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." 40 C.F.R. § 1508.7 (emphasis added).

740 F.Supp. at 1453 (footnote omitted).

To show that the cumulative impact analysis contained in the EIS is inadequate, plaintiffs must do more than posit the hypothetical possibility of relevant impacts outside the sale area. Further, it is unclear from plaintiffs' unadorned, summary allegations regarding the Service's method-

ology for evaluating cumulative impacts what authority would permit this court to substitute plaintiffs' judgment regarding appropriate procedures for that of the agency. The court may not impose procedural requirements on agencies beyond those provided by statute, the Constitution, or the agency's own rules. *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,* 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978). The court finds that plaintiffs have shown little likelihood of success on the merits of these claims.[15]

### H. *Missing Information.*

Plaintiffs assert that the Forest Service has failed to gather sufficient information about past impacts on local surface water quality to satisfy NEPA and to substantiate the Service's determination that application of the AHMU riparian management guidelines will mitigate adverse fisheries impacts. The Forest Service disagrees. The Service notes that both the agency and the State of Alaska have been monitoring and evaluating water quality impacts, and that the Service intends to continue monitoring water quality in the future pursuant to specific provisions detailed in the ROD. The Service further notes that the results of State and agency studies substantiate the Service's assessment of past impacts on water quality, which has been further reinforced by the State's determination that the ROD is consistent with the Alaska Coastal Management Plan.

NEPA and CEQ regulations impose a duty on federal agencies preparing an EIS to do independent research and otherwise endeavor to obtain missing information that is "important," "significant," or "essential" to a reasoned choice among alternatives, so long as the costs of obtaining that information are not exorbitant and the means of obtaining it are not beyond the state of the art. *Oregon Environmental Council,* 817 F.2d at 495 (discussing 40 C.F.R. § 1502.22(a). The Forest Service

---

**15.** Plaintiffs also contend that the Service failed to correlate site-specific cumulative impacts on subsistence resources with the specific needs of

each affected community. The court finds that this claim suffers the same infirmities described in section VI–F, above.

points to substantial evidence in the record rebutting plaintiffs' contention that water quality impact information is "missing" from the agency's analysis. The court finds that plaintiffs have not carried their burden of showing that these findings and the Service's conclusion are "arbitrary and capricious." Accordingly, there appears little likelihood that plaintiffs will succeed on the merits of these claims.

### I. *Unplanned Unit Layout Details.*

The FSEIS does not indicate precisely where on the ground logging boundaries within each harvest unit will be located because the Service does not finalize these boundaries until the unit is ready for logging. Plaintiffs argue that these decisions can and do have significant environmental consequences that escape evaluation because the Forest Service defers this detailed planning until after it has completed its analysis and chosen an alternative. According to plaintiffs, this practice violates NEPA because the statute requires the Service to delineate actual unit layouts for evaluation in the FSEIS.

One purpose of an EIS "is to apprise decisionmakers of the disruptive environmental effects that may flow from their decisions at a time when they 'retain[ ] a maximum range of options.'" *Conner v. Burford,* 848 F.2d 1441, 1446 (9th Cir.1988) (citations omitted). *Hanlon,* 740 F.Supp. at 1454. "Our circuit has held that an EIS must be prepared before any irreversible and irretrievable commitment of resources." *Conner,* 848 F.2d at 1441 (citations and footnote omitted) (interpreting 42 U.S.C. § 4332(C)(v)). NEPA does not require an agency to delay preparing an EIS simply because it has not yet developed detailed plans for a project. *See Inman Park Restoration, Inc. v. Urban Mass Transportation Admin.,* 414 F.Supp. 99, 117–18 (N.D.Ga.1975), *aff'd sub nom., Save Our Sycamore v. Metropolitan Atlanta Rapid Transit Auth.,* 576 F.2d 573 (5th Cir.1978). In fact, NEPA specifically prohibits such delay where it would require the agency to wait until after it has irreversibly and irretrievably committed resources. *Conner,* 848 F.2d at 1441.

The court finds that plaintiffs are "barking up the wrong tree" in seeking to require the Forest Service to complete detailed planning before preparing the FSEIS. The court rejects the notion that unplanned details of a project constitute "incomplete information" within the meaning of 40 C.F.R. § 1502.22(a). Instead, NEPA's supplementation provisions address the concerns underlying plaintiffs' unit layout claims. CEQ regulations "impose a duty on all federal agencies to prepare supplements to ... EIS's if there 'are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts.'" *Oregon Natural Resources Council,* 109 S.Ct. at 1858 (citations and footnote omitted) (discussing 40 C.F.R. § 1502.9(c) (1987)). Should the Service's predictions about the impacts of the chosen alternative prove to be mistaken because of incorrect assumptions made during general planning, the Service may have to supplement the FSEIS in the future. At this juncture, however, plaintiffs have shown little likelihood of success on the merits of their unit layout claims.

### J. *ANILCA's Tier–I Determination.*

As discussed in section VI–D–4, above, ANILCA § 810(a) requires federal agencies contemplating "the use, occupancy, or disposition of public lands" in Alaska to "evaluate the effect of such use, occupancy, or disposition on subsistence uses and needs, the availability of other lands for the purposes sought to be achieved, and other alternatives which would reduce or eliminate the use, occupancy, or disposition of public lands needed for subsistence purposes." 16 U.S.C. § 3120(a). Section 810(a) further directs the agency to make a threshold determination whether the contemplated action "would significantly restrict subsistence uses." *Id.* This determination may be referred to as the "tier-I" evaluation. *See Tribal Village of Akutan v. Hodel,* 792 F.2d 1376, 1377 (9th Cir.1986), *vacated on other grounds,* 480 U.S. 943, 107 S.Ct. 1598, 94 L.Ed.2d 785 (1987). Unless the agency concludes its tier-I evaluation with a finding of no significant restric-

tion ("FONSR"), the statute imposes additional obligations that may be referred to as "tier-II." *Hanlon,* 740 F.Supp. at 1448. Where the agency makes an affirmative tier-I determination, section 810(a)(1)–(3) requires the agency to give notice to the communities affected, hold public hearings, and make specified findings about the propriety of the proposed action and the measures that will be taken to mitigate adverse impacts on subsistence uses and resources. *Id.* (discussing 16 U.S.C. § 3120(a)(1)–(3)).

Plaintiffs suggest that the Forest Service erroneously found no significant restriction of subsistence for one AA because the Service applied the wrong legal standard in its tier-I evaluation. Specifically, plaintiffs assert that the "significant possibility of significant restriction" standard used by the Service resurrected the "likelihood" standard that this court rejected in *Hanlon.* The plaintiffs are mistaken. In *Hanlon,* this court expressly endorsed the standard the Service used here: "The tier-II requirements apply whenever there is a *significant possibility of significant restriction;* such restriction need not be likely." 740 F.Supp. at 1449 (emphasis added); *see also People of Village of Gambell v. Hodel,* 774 F.2d 1414, 1422 (9th Cir.1985), *rev'd in part and vacated in part on other grounds sub nom., Amoco Production Co. v. Gambell,* 480 U.S. 531, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987); *Tribal Village of Akutan,* 792 F.2d at 1379; *Sierra Club v. Penfold,* 664 F.Supp. 1299, 1307 (D.Alas.1987), *aff'd,* 857 F.2d 1307 (9th Cir. 1988). Plaintiffs have shown no likelihood of success on the merits of this claim.

### K. *ANILCA's Tier–II Procedures.*

Where, as here, the agency finds a significant possibility of significant restriction of subsistence uses within a portion of the area affected by the project, thus making an affirmative tier-I determination under ANILCA, certain of that statute's tier-II provisions, section 810(a)(1)–(2), require the agency to notify and hold hearings for the affected communities. Before proceeding with the proposed disposition of public lands, the agency must:

(1) giv[e] notice to the appropriate State agency and the appropriate local commit-

tees and regional councils established pursuant to section 3115 of this title; [and]

(2) giv[e] notice of, and hol[d], a hearing in the vicinity of the area involved.

16 U.S.C. § 3120(a)(1)–(2).

### 1. SCHEDULING AND PARTICIPATION PROVISIONS.

Plaintiffs first contend that the ANILCA hearings were inadequate because they were scheduled during a fishing opening and because interested parties who were unable to attend were not permitted to participate by marine radio. The Service notes that the distributed notices included provision for participation by mail or by proxy. The Service further asserts that the pressing need to complete the SEIS made it inappropriate to delay the hearings until the end of the fishing season.

The court is not at liberty to impose procedural requirements on the Forest Service beyond those provided by statute, the Constitution, or the agency's own rules. *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council,* 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978). The court finds that the procedures employed by the Service more than meet the "statutory minima" prescribed by NEPA, ANILCA, and the APA, as well as satisfying the requirements of procedural due process. See *id.,* 435 U.S. at 548, 98 S.Ct. at 1214. Plaintiffs' scheduling and participation claims thus appear to be without merit.

### 2. SOLICITATION OF COMMUNITY COMMENTS.

Plaintiffs next allege that the ANILCA hearings were inadequate because the Service did not solicit subsistence use information from the communities. As the Service correctly notes, the hearing transcripts included in the FSEIS contain instructive comments on subsistence use and concerns that belie plaintiffs' claim. This claim also appears to be without merit.

### 3. ADEQUACY OF NOTICE.

Pursuant to ANILCA's notice requirement, the Service distributed the DSEIS to

affected communities before holding hearings. As discussed in section VI–F, above, plaintiffs contend that the DSEIS fails to correlate the specific subsistence needs of each affected community with the site-specific impacts of proposed harvesting on subsistence resources, discussed in the EIS's. Plaintiffs argue that these alleged deficiencies in the DSEIS invalidate the community notices and hearings, because the DSEIS did not provide sufficient information on the project's effect on each community to facilitate the communities' meaningful participation in the decision.

The Forest Service notes that the DSEIS contains information for each hunting area on subsistence and nonsubsistence taking, expected impacts from harvesting on wildlife carrying capacity, hunting access, and competition. The Service contends that any community-specific questions not expressly addressed in the DSEIS were adequately addressed before the hearings during lengthy "open house" meetings at which the agency discussed impacts on harvest units thought to be of particular concern to each community.

As the court indicated in section VI–F, above, it does not appear likely that plaintiffs will succeed in the merits of this claim in light of the additional information regarding subsistence use that the Service provided to affected communities prior to each ANILCA hearing. Assuming, without holding, that the EIS's fail to correlate the specific subsistence needs of each affected community with the site-specific impacts of proposed harvesting on subsistence resources, the court nevertheless finds that these arguable deficiencies appear to have been cured by the Service's supplemental presentations.

## L. *ANILCA's Tier–II Substantive Obligations.*

ANILCA § 810(a)(3) prohibits federal land managers from effecting any "use, occupancy or disposition" of public lands in Alaska "which would significantly restrict subsistence uses" until the official has determined that:

(A) such a significant restriction of subsistence uses is necessary, consistent with sound management principles for the utilization of the public lands,

(B) the proposed activity will involve the minimal amount of public lands necessary to accomplish the purposes of such use, occupancy, or other disposition, and

(C) reasonable steps will be taken to minimize adverse impacts upon subsistence uses and resources resulting from such actions.

16 U.S.C. § 3120(a)(3).

### 1. 810(a)(3)(A): NECESSITY AND CONSISTENCY WITH SOUND MANAGEMENT.

The Service determined that the chosen alternative may significantly restrict subsistence uses in three of four affected AA's, triggering its obligation under ANILCA § 810(a)(3)(A) to certify that this disposition of public land is "necessary, consistent with sound management principles for the utilization of the public lands." The Service determined that harvesting in accordance with the selected alternative is "necessary to meet existing contractual and other legal obligations, consistent with sound management of public lands." ROD at 20, 25, 40.

Plaintiffs contend that the certification of necessity and consistency required under ANILCA § 810(a)(3)(A) obligates the agency to consider all the management objectives and guidelines embodied in the plenum of resource management statutes and regulations governing management of the national forest lands at issue. Plaintiffs argue that the "consistency" provision obligates the agency to confirm that the proposed action complies with all relevant statutory and regulatory guidelines. Further, plaintiffs argue that the "necessity" provision obligates the agency also to confirm that the proposed action is necessary to promote all relevant resource management objectives. Plaintiffs note that the Service adjudged several alternatives inconsistent with contractual objectives and declined to consider them without first determining if these alternatives would be less restrictive of subsistence interests. According to plaintiffs, this demonstrates that the Forest Service's determination of necessity and

consistency was based solely on contractual considerations, not on consideration of all the relevant factors.

The Forest Service contends as an initial matter that ANILCA's tier-II provisions impose no substantive obligations on the agency and, therefore, do not circumscribe the agency's discretion to designate the project's purpose or to disregard alternatives which do not promote that purpose. However, the Service does not dispute that section 810(a)(3)(A) requires "consistency" with all the relevant statutory and regulatory guidelines. Instead, the Service avers that the record reflects full consideration of these factors, and that plaintiffs have made no showing that the chosen alternative is not "consistent" with any of those guidelines. Finally, the Service argues that an action required by contract may be deemed "necessary" within the meaning of ANILCA.

The court disagrees with the Service's initial proposition that ANILCA's tier-II provisions impose no substantive obligations on the agency: [16]

> The purpose of ANILCA § 810 is to protect Alaskan subsistence resources from unnecessary destruction. Section 810 does not prohibit all federal land use actions which would adversely affect subsistence resources but sets forth a procedure through which such effects must be considered *and provides that actions which would significantly restrict subsistence uses can only be un-*dertaken *if they are necessary and if the adverse effects are minimized.*

*Amoco Production Co.,* 107 S.Ct. at 1403 (emphasis added). Technically, the Service is correct that ANILCA does not circumscribe its discretion to designate the project's purpose or to disregard alternatives which do not promote that purpose. However, where an agency fails to consider and select an alternative that can be certified as both "necessary" and "consistent with sound management principles for the utilization of the public lands" within the meaning of ANILCA § 810(a)(3)(A), the agency proceeds at its peril, for the failure to satisfy this statutory prerequisite bars the agency from proceeding with its proposed disposition of the public lands.

On the other hand, it appears that the Service did make the requisite "consistency" determination. Plaintiffs have not carried their burden of refuting the Service's assertion in the ROD that the chosen alternative is consistent with applicable regulatory and statutory guidelines.

Further, the court rejects as implausible plaintiffs' proposed definition of "necessary" within the meaning of the statute. Section 810(a)(3)(A) bars certain agency actions that cause significant restriction of subsistence interests. Under plaintiffs' definition of "necessary," an agency would be barred from proceeding with an action that is both *consistent* with *all* relevant management guidelines and *necessary* to

**16.** An agency's interpretation of a statute that it is charged with administering generally is entitled to substantial deference. *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 844–45, 104 S.Ct. 2778, 2782–83, 81 L.Ed.2d 694 (1984); *Norfolk Energy, Inc. v. Hodel,* 898 F.2d 1435, 1439 (9th Cir.1990). A court reviewing the agency's construction first must determine whether "Congress has directly spoken to the precise question at issue." *Chevron, U.S.A.,* 467 U.S. at 842, 104 S.Ct. at 2781; *Tyonek Native Corp. v. Secretary of Interior,* 836 F.2d 1237, 1239 (9th Cir.1988). "If the intent of Congress is clear" and "unambiguou[s]," the court must give effect to that intent. *Chevron, U.S.A.,* 467 U.S. at 842–43, 104 S.Ct. at 2781; *Tyonek Native Corp.,* 836 F.2d at 1239. "[I]f the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron, U.S.A.,*

467 U.S. at 843, 104 S.Ct. at 2881–82; *Tyonek Native Corp.,* 836 F.2d at 1239.

Ultimately, however, the courts are the final authorities on issues of statutory construction. *I.N.S. v. Cardoza–Fonseca,* 480 U.S. 421, 107 S.Ct. 1207, 1221, 94 L.Ed.2d 434 (1987); *Chevron, U.S.A.,* 467 U.S. at 843 n. 9, 104 S.Ct. at 2781 n. 9; *State of Alaska v. Lyng,* 797 F.2d 1479, 1481 (9th Cir.1986). A reviewing court must reject an agency's statutory construction if it is contrary to clear congressional intent. *Cardoza–Fonseca,* 107 S.Ct. at 1221; *Chevron, U.S.A.,* 467 U.S. at 843 n. 9, 104 S.Ct. at 2781 n. 9; *Lyng,* 797 F.2d at 1481–82. "If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect." *Cardoza–Fonseca,* 107 S.Ct. at 1221 (quoting *Chevron, U.S.A.,* 467 U.S. at 843 n. 9, 104 S.Ct. at 2782 n. 9).

promote *some* permissible management objective unless that action also is necessary to promote *all* permissible objectives. The court notes, however, that the resource management statutes cited by plaintiffs [17] are not redundant—they have diverse and in some senses disparate goals. Plaintiffs do not suggest how a single project could be so quintessential as to be deemed "necessary" to promote all of such a diverse set of statutory objectives. Moreover, plaintiffs cite no evidence in the legislative history that Congress intended to restrict agency discretion so severely when it enacted ANILCA.

Finally, the court agrees with the Forest Service that plaintiffs have not shown why an action required by contract may not be deemed "necessary" within the meaning of ANILCA. Accordingly, success on the merits of plaintiffs' section 810(a)(3)(A) claims appears unlikely.

2. 810(a)(3)(B): MINIMAL AMOUNT OF PUBLIC LANDS.

Because the Service determined that the chosen alternative may significantly restrict subsistence uses in three of four affected AA's, it is required under ANILCA § 810(a)(3)(B) to certify that "the proposed activity will involve the minimal amount of public lands necessary to accomplish the purposes of" the project. The Service concluded that the same amount of timber could be harvested using less public land only by intensifying activity in certain high-yield areas, which would cause greater impacts to subsistence resources.

Plaintiffs contend that the Forest Service used the wrong legal standard under section 810(a)(3)(B). According to plaintiffs, the Service should have asked not whether the project's purpose could be fulfilled using less public land overall, but rather whether the Service's goals could be accomplished using less public land valued for subsistence use. Plaintiffs suggest that the purpose of ANILCA § 810 to minimize impacts on subsistence uses and the canon of statutory construction favoring

Native Americans support plaintiffs' proposed construction of the statute.

When considering a question of statutory construction the reviewing court generally must assume "that the legislative purpose is expressed by the ordinary meaning of the words used." *Richards v. United States*, 369 U.S. 1, 9, 82 S.Ct. 585, 591, 7 L.Ed.2d 492 (1962); *Buettner v. Kavilco, Inc.*, 860 F.2d 341, 343 (9th Cir.1988). The reviewing court determines the plain meaning of the statute by looking "to the particular statutory language at issue, as well as the language and design of the statute as a whole." *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291, 108 S.Ct. 1811, 1817, 100 L.Ed.2d 313 (1988) (citation omitted); *Seldovia Native Ass'n, Inc. v. Lujan*, 904 F.2d 1335, 1339 (9th Cir.1990).

It is true that "even where the meaning of the words is plain, the circumstances of the enactment of legislation may persuade [the reviewing court] that Congress did not intend words of common meaning to have their literal effect." *State of Alaska v. Lyng*, 797 F.2d at 1483. However, "[a]bsent a clearly expressed legislative intention to the contrary, [the statutory] language must ordinarily be regarded as conclusive." *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980); *Seldovia Native Ass'n, Inc.*, 904 F.2d at 1339.

As the Forest Service correctly notes, "public lands" is a term of art specifically defined by statute without reference to subsistence interests for purposes of the relevant section of ANILCA. *See* 16 U.S.C. § 3102(3). Moreover, Congress expressly denoted the type of public lands with which it was concerned in the relevant provisions of section 810(a). Where Congress intended to restrict a statutory reference to public lands needed for subsistence purposes, it did so expressly: in the subsection of the statute directing the acting agency to make its tier-I threshold evalua-

---

**17.** National Forest Management Act, 16 U.S.C. §§ 1600–1614; Multiple–Use Sustained–Yield Act, 16 U.S.C. §§ 528–531; Endangered Species Act, 16 U.S.C. §§ 1531–1543; Fish and Wildlife

Coordination Act, 16 U.S.C. §§ 661–666c; Coastal Zone Management Act, 16 U.S.C. §§ 1451–1464; and Alaska Coastal Management Program, Alas.Stat. 46.40.010–.210 (1987).

tion, Congress expressly required the agency to evaluate the availability of alternatives requiring less "public lands *needed for subsistence purposes*." 16 U.S.C. § 3120(a) (emphasis added). The contrast between this statutory language and that employed in subsection 810(a)(3)(B) is unmistakable. In the latter subsection, where Congress imposed prerequisites for federal agencies contemplating a "use, occupancy or disposition" of public lands causing significant restriction of subsistence uses, Congress expressly required the agency to make its tier-II determination that "the proposed activity will involve the minimal amount of public lands *necessary to accomplish the purposes of such use, occupancy, or other disposition*." 16 U.S.C. § 3120(a)(3)(B) (emphasis added).

The court agrees that plaintiffs' proffered construction is more consonant with the overall purpose of ANILCA § 810. However, the court may not deprive Congress's chosen terms of "their literal effect," *Lyng*, 797 F.2d at 1483, "[a]bsent a clearly expressed legislative intention to the contrary." *Consumer Product Safety Comm'n*, 447 U.S. at 108, 100 S.Ct. at 2056; *Seldovia Native Ass'n, Inc.*, 904 F.2d at 1339. Accordingly, success on the merits of plaintiffs' section 810(a)(3)(B) claims appears unlikely.[18]

### 3. 810(a)(3)(C): MINIMIZING ADVERSE SUBSISTENCE IMPACTS.

Because the Service determined that the chosen alternative may significantly restrict subsistence uses in three of four affected AA's, it is required under ANILCA § 810(a)(3)(C) to certify that "reasonable steps will be taken to minimize adverse impacts upon subsistence uses and resources resulting from" the chosen alternative. The Service made this certification, after proposing a variety of subsistence mitigation measures in the FSEIS and ROD, including precommercial thinning, post-sale closure of spur roads, a joint undertaking with the Alaska Department of Fish and Game to educate residents of logging camps regarding ways of avoiding destructive confrontations with bears, and

requesting state officials to change hunting and trapping regulations in order to mitigate impacts on marten, deer, and bear. Plaintiffs generally are critical of the Service's mitigation proposal, but offer no suggestions of their own. Plaintiffs contend that the proposed measures are ineffective or of unproven efficacy, and that the joint proposals constitute impermissible abdications of the Service's own mitigation responsibilities.

The court finds that plaintiffs have failed to carry their burden of proving the existence of viable, preferable, ascertainable mitigation alternatives, or of showing why the Service's proposal is "arbitrary and capricious." Accordingly, success on the merits of plaintiffs' section 810(a)(3)(C) claims appears unlikely.

### M. *Clean Water Act Violations.*

Plaintiffs argue that activities under the chosen alternative will cause water quality impacts that will violate Alaska state water quality standards, and that the ROD thus contravenes the Clean Water Act. For the reasons set forth in section VI–H, above, there appears little likelihood that plaintiffs will succeed on the merits of their CWA claims.

### N. *National Forest Management Act Violations.*

Plaintiffs argue that the Forest Service has failed to revise the Contract under section 15(b) of the NFMA. Pub.L. No. 94–588, § 15(b), 90 Stat. 2960–61 (1976). Plaintiffs provide no support whatsoever for this argument. Accordingly, there appears little likelihood that plaintiffs will succeed on the merits of their NFMA claims.

### O. *Interlocutory Relief.*

The court has determined that there may be a high probability of success on the merits of plaintiffs' claim challenging the no-action alternative, discussed in section VI–E, above. *See Big Country Foods*, 868

---

**18.** For the reasons stated in section VI–F, above, the court further finds without merit plaintiffs' claim that the Service's determination under

this subsection is deficient because the agency failed to identify critical subsistence use areas within the AA's.

F.2d at 1088. The defects in the Service's no-action analysis are merely "technical deficiencies," however, *see Oregon Environmental Council,* 817 F.2d at 492, and implicate none of plaintiffs' environmental or subsistence interests. Although the Service did not analyze the impacts associated with suspension of harvesting in all the AA's at once, it did analyze the consequence of nonaction in each AA. Had the Forest Service fully complied with NEPA's requirements in this regard, it would have discovered no environmental or subsistence impacts that are not already disclosed in the FSEIS. Further, plaintiffs cannot reasonably argue that the Service might have been more inclined to select the no-action alternative if it had made the proper unitary analysis, because simultaneous area-wide suspension of harvesting would be a greater sacrifice of the agency's performance goals under the Contract. The second defect in the Service's no-action analysis—the failure to evaluate the economic consequences of breaching Contract—likewise implicates none of plaintiffs' environmental or subsistence interests. The court thus finds preliminary injunctive relief unwarranted on plaintiffs' no-action claim.

Plaintiffs have failed even to raise "serious questions" with respect to their other claims. Accordingly, the court finds that no preliminary injunctive relief is warranted.

## VII. ORDER.

Accordingly, IT IS ORDERED:

(1) THAT the motion to amend complaint filed January 8, 1990 (Docket No. 144) by plaintiffs City of Tenakee Springs et al. is GRANTED;

(2) THAT the Clerk shall file the amended complaint lodged January 8, 1990;

(3) THAT plaintiffs' motion for leave to file a second amended complaint filed February 2, 1990 (Docket No. 153) is GRANTED;

(4) THAT the Clerk shall file the second amended complaint lodged February 2, 1990;

(5) THAT the motion for partial dismissal filed March 7, 1990 (Docket No. 171) by defendants United States Forest Service et al. is DENIED;

(6) THAT the Forest Service's motion to strike exhibits filed February 21, 1990 (Docket No. 163) is GRANTED IN PART as more fully set forth in section V., above;

(7) THAT the Clerk shall strike exhibits number 11, 12, and 21 supporting plaintiffs' motions for preliminary injunction;

(8) THAT the Clerk shall file the motion for preliminary injunction inadvertently lodged with plaintiffs' rejected motion to file overlength brief filed January 8, 1990 (Docket No. 145);

(9) THAT the motion for preliminary injunction inadvertently lodged with plaintiffs' rejected motion to file overlength brief filed January 8, 1990 (Docket No. 145) is DENIED; and

(10) THAT plaintiffs' supplemental motion for preliminary injunction filed February 2, 1990 (Docket No. 154) is DENIED.